[No. 40531.    En Banc.    April 2, 1970.]

KITSAP-MASON DAIRYMEN'S ASSOCIATION, *Respondent,* v. WASHINGTON STATE TAX COMMISSION, *Appellant.**

*The Attorney General, Henry W. Wager* and *J. Richard Duggan, Assistants,* for appellant.

*Wm. R. Garland,* for respondent.

STAFFORD, J.—The Washington State Tax Commission imposed a deficiency tax assessment against the Kitsap-Mason Dairymen's Association. The Tax Commission appeals

*Reported in 467 P.2d 312.

from the trial court's judgment that granted Kitsap a tax refund of $4,957.30 with interest and costs.

During the audit period (January 1, 1962 to March 31, 1966) Kitsap sold between two and three hundred thousand dollars worth of dairy products a month, a substantial part of which was subject to retail sales tax.

Most retail sales were made on home delivery routes. Customers received itemized monthly bills which included the applicable sales tax on the total invoice price of their purchases. As an incentive for prompt payment Kitsap offered such customers a reduction amounting to 5 per cent of the total invoice price, if they made full payment of their monthly statement within 20 days of billing. The exact amount of the potential discount was noted on each monthly statement. Kitsap was unable to determine the actual sales price of its merchandise until its customers either took advantage of the discount or permitted the 20 day period to elapse without payment.[1]

Kitsap's method of bookkeeping did not provide for segregating the sales tax from the gross selling price of merchandise. Net retail sales were determined by deducting non-taxable sales[2] and customer discounts from gross sales. The "selling price" was derived from dividing the net retail sales figure by 100 per cent plus the applicable tax rate.[3] The "selling price" was then multiplied by the applicable tax rate to obtain the amount actually *remitted* to the Tax Commission as the tax due for retail sales. On the other hand, sales tax *collected* from each customer was based on the total invoice price of merchandise sold to each *before* allowance of his potential discount.

The procedure gave an apparent advantage to diligent customers, but the erroneous bookkeeping practice also re-

[1] Kitsap maintained five closing dates to distribute the bookkeeping workload throughout the month. Thus, there was no specific date on which is was possible to determine whether the customers had taken advantage of the discount.

[2] These consisted of tax exempt sales and a few wholesale transactions.

[3] The tax rate was 4 per cent during the first part of the audit period and 4.2 per cent during the remainder.

sulted in Kitsap collecting regularly, from every such customer, more retail sales tax than it remitted to the state.[4]

Kitsap used the foregoing method of reporting for 15 years. It was not questioned by the Tax Commission until the current audit.

The assignments of error raise several questions. First: Is the cash deduction offered customers for prompt payment a "cash discount"? Answer: Yes.

The retail sales tax is imposed by RCW 82.08.020 which reads in part as follows:

> There is levied and there shall be collected a tax on each retail sale . . . equal to four and one-half per cent of the *selling price:* . . .

(Italics ours.) "Selling price" as defined by RCW 82.08.010 means:

> the consideration . . . *paid* . . . *by a buyer to a seller,* all without any deduction on account of the cost of tangible property sold, the cost of materials used, labor costs, interest, discount, delivery costs, taxes, or any other expenses whatsoever paid or accrued and without any deduction on account of losses; *but shall not include the amount of cash discount actually taken by a buyer;* . . .

(Italics ours.) "Cash discount" is defined by RCW 82.04.160[5] as follows:

---

[4]The bookkeeping procedure can be best explained by the method outlined in the statement of facts. Assuming an invoice price of $100 for merchandise and a sales tax of 4 per cent, the customer's statement would show $100 plus retail sales tax of $4 (a total bill of $104). The customer would be informed, by a notation on the invoice, that he could deduct $5 from the total bill (5 per cent of the invoice price excluding the sales tax) if he paid in full within 20 days. If he took advantage of the discount, he would remit $99 ($104 minus the $5 discount). Kitsap *collected* $4 in retail sales tax.

On the other hand, to determine the retail sales tax actually *remitted* to the state in the example given, Kitsap would divide the $99 by 104 per cent (100 per cent plus the applicable tax rate) to arrive at a "selling price" of $95.20. The 4 per cent tax rate would then be applied to the "selling price" to arrive at the tax *remitted* to the state, or $3.80. Kitsap would retain the 20 cents overage.

[5]RCW 82.08.010(4) makes RCW 82.04.160 applicable to retail sales tax.

*a deduction* from the invoice price of goods . . . which is *allowed if the bill is paid on or before a specified date.*

(Italics ours.) Clearly the deduction granted Kitsap's retail customers was a "cash discount" within the contemplation of RCW 82.08.010 and RCW 82.04.160. Any other interpretation would strain the meaning of plain words used by the legislature.

Second: Does Tax Commission Rule 108 exceed the policy of RCW 82.08.010? Answer: No.

Tax Commission Rule 108 was enacted by virtue of the rule making authority vested in the Tax Commission by RCW 82.32.300. Its purpose was to clarify and supplement RCW 82.08.010 and to prevent the type of problem here involved. Insofar as pertinent, the rule reads:

The selling price . . . of an article . . . does not include the amount of . . . cash discount actually taken by the buyer and the amount of such discount may be deducted from gross proceeds of sales providing such amount has been included in the "Gross Amount" reported. *Cash discounts are not deductible under the Retail Sales Tax when such tax is collected upon the selling price before the discount is taken and no portion of the tax is refunded to the buyer.*

(Italics ours.)

■ An agency may not legislate under the guise of the rule making power. Rules must be written within the framework and policy of the applicable statutes. *State ex rel. West v. Seattle,* 50 Wn.2d 94, 309 P.2d 751 (1957). They may not amend or change enactments of the legislature. *Pringle v. State,* 77 Wn.2d 569, 464 P.2d 425 (1970), *Pierce County v. State,* 66 Wn.2d 728, 404 P.2d 1002 (1965).

■ The rule does not exceed the policy or framework of RCW 82.08.010 and RCW 82.08.020 specifically or RCW 82.08 generally. Further, it neither amends nor changes the enactments of the legislature. It does no more than state in the form of a prohibition a policy stated affirmatively in the statutes. RCW 82.08.010 and RCW 82.08.020 do not authorize the collection of a retail sales tax on a "cash discount". Rule 108 reaches the same end. A seller who remits the tax

is prohibited from deducting from invoice prices "cash discounts" on which a tax has been paid.

It is clear that the tax is to be paid by the buyer and collected by the seller. RCW 82.08.050. The rate schedules are calculated to equalize, insofar as possible, the amount of tax collected with the amount remitted. RCW 82.08.060. The money so collected is held in trust for the state by the seller. RCW 82.08.050. It was not intended that the seller profit by his role as tax collector. Rule 108 is consistent with that policy.

Third: If taxes collected in the name of the state exceed the amount due and remitted by the seller, may the seller retain the excess funds? Answer: No.

It is clear the retail sales tax is to be levied on the "selling price" less "cash discount". Kitsap followed the procedure correctly when it computed the amount of sales tax to be *remitted*. However, the retail sales tax *collected* was based on the total invoice price *before* allowance of the customer's "cash discount". Thus, Kitsap collected a tax on the gross selling price and thereby failed to give its customers a corresponding tax reduction on the "cash discount". Looking at it another way, as indicated in note 4, Kitsap would have collected a tax of 20 cents on the $5 discount and would have retained the 20 cents for its own use.

Kitsap argues it is not a mere conduit through which taxes flow from purchaser to the Tax Commission; the amount of money *collected* in taxes is unimportant because it is liable to *remit* only the tax found due on the recomputed selling price; and, it is entitled to retain the overage. We do not agree.

The tax is designed to be paid by the purchasing public. The seller must collect it from the public and hold it in trust for the Tax Commission.[6] The seller incurs a personal

[6]RCW 82.08.050 provides in part: "The tax hereby imposed shall be paid by the buyer to the seller, and *each seller shall collect* from the buyer the full amount of the tax payable in respect to each taxable sale in accordance with the schedule of collections adopted by the tax commission pursuant to the provisions of RCW 82.08.060. The tax required by this chapter, to be *collected by the seller,* shall be deemed to be *held in trust by the seller until paid to the commission,* and any

liability only if he fails to collect the tax imposed, or having collected it fails to remit it to the Tax Commission.[7] In fact, in the event of such failure, the Tax Commission is authorized to proceed, in the alternative, directly against the buyer. RCW 82.08.050.

Inherent in RCW 82.08 is the fact that taxes collected in the name of the state are not property of the seller. It is a misdemeanor to convert taxes collected to one's own use. RCW 82.08.050. The integrity of the entire taxing system demands that funds collected as taxes be remitted to the state.

It is contended that the following comment from *White v. State*, 49 Wn.2d 716, 724, 306 P.2d 230 (1957) entitles Kitsap to retain the excess taxes collected:

> It is apparent, in reading the statute as a whole, that a distinction is made between the tax imposed and the tax to be paid by the buyer and collected by the seller. The former remains constant—3 per cent on each sale—while the latter varies according to the schedule which the tax commission is authorized to issue. The inevitable result is that, *in some instances, a seller will collect more tax than he is required to remit to the state, and in others, he will collect less.*

(Italics ours.) *White* is not applicable, however, to the problem before us.

*White* does not stand for the proposition that a seller who *constantly* collects, in the name of the state, more than he is required to remit, is entitled to retain the overage for his own use. *White* involved a vending machine operation. The tax collected on individual items amounted to a fraction of a cent. Because of the "bracket system" of collec-

seller who appropriates or converts *the tax collected* to his own use or to any use other than the payment of the tax to the extent that the money required to be collected is not available for payment on the due date as prescribed in this chapter shall be guilty of a misdemeanor." (Italics ours.)

[7]RCW 82.08.050 also provides in part: "In case any seller fails to collect the tax herein imposed or having collected the tax, fails to pay it to the commission in the manner prescribed by this chapter, whether such failure is the result of his own acts or the result of acts or conditions beyond his control, he shall, nevertheless, be personally liable to the state for the amount of the tax."

tion, the seller was required to absorb the fractional cent on some occasions, thereby benefiting the buyer, and on others it was absorbed by the buyer, thus benefiting the seller. Under the statute, since amended,[8] the legislature simply sought to reach a balancing of the negligible overages and shortages which occurred under the "bracket" system.

In the instant case, the seller never reached, nor did it even seek, a balance between the collection and the remittance of taxes. The taxes collected *always* exceeded remittances and *always* benefited the seller. RCW 82.08 never intended such a result and it was not sanctioned by *White*.

The final question is whether the state is estopped from enforcing RCW 82.08 and Tax Commission Rule 108. The answer is no.

■ The pertinent statutes and rules have not been changed materially since the Revenue Act was adopted in 1935. Even assuming the auditors misconstrued the law, the erroneous construction is not controlling merely because of subsequent legislative inaction. *Latimer v. Western Mach. Exch.*, 40 Wn.2d 155, 241 P.2d 923 (1952).[9] This is particularly true when there is nothing to indicate that the legislature was aware of such administrative interpretation.

This is not a case in which auditors changed their interpretation of a statute or rule. It is one in which they overlooked through ignorance, neglect or inadvertance Kitsap's error in computing the tax. The fact that the oversight only recently has been discovered does not relieve Kitsap of its liability for the correct tax during the audit period now under consideration.

■ The doctrine of estoppel will not be lightly invoked against the state to deprive it of the power to collect taxes. The state cannot be estopped by unauthorized acts, admissions or conduct of its officers. *Wasem's, Inc. v. State*, 63

[8]The 1963 legislature amended RCW 82.08.080 to lower the application of the tax to but 60 per cent of the seller's gross receipts when sales are made through vending machines.

[9]Reversed on other grounds when reheard. *Latimer v. Western Mach. Exch.*, 42 Wn.2d 756, 259 P.2d 623 (1953).

Wn.2d 67, 385 P.2d 530 (1963); *Bennett v. Grays Harbor County,* 15 Wn.2d 331, 130 P.2d 1041 (1942); *see also,* 1 A.L.R.2d 338 (1948).

The judgment of the trial court is reversed.

ALL CONCUR.