[No. 51941–2. En Banc. July 17, 1986.]

GROUP HEALTH COOPERATIVE OF PUGET SOUND, INC., *Respondent*, v. THE DEPARTMENT OF REVENUE, *Appellant*.

*Kenneth O. Eikenberry, Attorney General,* and *Linda C. Krese, Assistant,* for appellant.

*Phillip H. Ginsberg, Linda B. Eide,* and *Riley, Skellenger, Ginsberg & Bender,* for respondent.

CALLOW, J.—Group Health Cooperative, a nonprofit health maintenance organization, provides comprehensive health care services on a prepaid basis to its members through its medical staff and facilities. Group Health was audited and deductions disallowed. It seeks a refund of business and occupation taxes based on a deduction allowed public entities for health or social welfare services rendered, pursuant to RCW 82.04.4297.

The first challenge to Group Health is that its executives are not paid salaries comparable to salaries paid like positions in the public service. The second claim by the State is that business and occupation taxes should be assessed on carpentry and print activities performed at Group Health and the third claim involves the appropriate date upon which a Department of Revenue change of position regarding a deduction should be deemed effective.

The trial court held that Group Health was a health or social welfare organization entitled to the deduction allowed by RCW 82.04.4297. The Department appeals this ruling. The trial court also decided on summary judgment that (a) business and occupation taxes were correctly assessed on the carpentry and print activities, and (b) the change of position became effective on the date the Department notified Group Health of that change, rather

than the date the Department "officially" adopted the change as policy. Group Health cross-appeals these judgments. We affirm the trial court on all issues.

RCW 82.04.431(1)(b) and RCW 82.04.4297

RCW 82.04.431 defines a health or social welfare organization for the purposes of RCW 82.04.4297.[1] Prior to trial the parties agreed that Group Health met all of the criteria enumerated in RCW 82.04.431, except for section (1)(b). RCW 82.04.431(1)(b) requires the "[s]alary or compensation paid to its officers and executives must be . . . at levels *comparable* to the salary or compensation of like positions within the public service of the state". (Italics ours.) The titles of President, Vice-President, Secretary and Treasurer are given to persons who apparently serve only in an honorary, ceremonial or voluntary capacity. These persons, so titled, are not compensated for holding their positions. They do not perform daily management activity for Group Health. They are not the officers and executives of Group Health who actually render services, and the amount of their salaries is immaterial to the issue and this appeal.

EVIDENCE SUPPORTING DEDUCTION

During the trial Group Health produced the testimony of Mr. Ralph Bremer and Dr. David Goldsmith. Mr. Bremer, a past president of the Board of Trustees, testified in general about the services Group Health provides and about the organization itself. Mr. Bremer stated that Group Health is governed by an 11-person Board elected by the membership. Board members are not compensated. The bylaws of the organization provide for four officers: Presi-

---

[1]RCW 82.04.4297 provides:

"Deductions—Compensation from public entities for health or social welfare services. In computing tax there may be deducted from the measure of tax amounts received from the United States or any instrumentality thereof or from the state of Washington or any municipal corporation or political subdivision thereof as compensation for, or to support, health or social welfare services rendered by a health or social welfare organization or by a municipal corporation or political subdivision."

dent, Vice–President, Secretary and Treasurer. The Board may also approve additional vice–presidents for purposes of executive management. Mr. Bremer identified the following as "senior or top management": Executive Vice–President (also called the Chief Executive); Vice–President of Finance and Administration; Vice–President for Health Care; Central and Eastside Regional Administrators; General Counsel; Director of Policy and Planning; and Director of Public and Employee Relations. The latter three executives report directly to the Executive Vice–President. All of these positions have significant contacts with the Board. In addition, the top level medical staff position, Chief of Staff, has extensive contacts with the Board. Some middle–level staff on occasion report to the Board; lesser management has little contact.

Mr. Bremer testified as to salary–setting procedures. The Executive Vice–President has overall responsibility for establishing salary and compensation policy. Mr. Bremer stated that the employees and executives of Group Health are not paid anything above actual services rendered.

Dr. Goldsmith testified as an expert in the area of wage and salary studies. Dr. Goldsmith had conducted a study of the salaries received by the executives of Group Health as compared with the salaries received by public sector employees in like positions. Dr. Goldsmith identified the following Group Health positions as executive: Executive Vice–President, Vice–President for Finance and Administration, Vice–President for Health Care, Chief of Medical Staff, Regional Administrator, General Counsel, Director of Policy and Planning, and Director of Public and Employee Relations.

The data for Dr. Goldsmith's analysis included organizational charts, job descriptions and salary records. This same type of data had been utilized in wage and salary studies by his firm since 1974. Professional colleagues in the same field rely on this type of data for their work.

Dr. Goldsmith outlined the procedures used to analyze the data that had been collected. First, he identified the

criteria employed for the selection of "executive" positions at Group Health, and for the selection of comparable organizations from which possible comparisons might be drawn. A "probable comparable set" was identified. Second, Dr. Goldsmith sought to validate the collected data through interviews with at least one person within each identified comparable organization. Over 20 such interviews were conducted by his assistants. Third, the salaries of Group Health's executives were compared with the salaries of those in positions identified as comparable. To validate the information gained to this point, Dr. Goldsmith used the Willis System, a method utilized by the State of Washington since 1973.

Based on his analysis and the results of the validation technique, Dr. Goldsmith testified that in his opinion the public service positions selected for comparison to Group Health positions were comparable both in terms of the content of positions and in terms of salary ranges for such positions.

Group Health offered into evidence a Group Health Cooperative Retrospective Compensation Study. This study comprised a series of charts prepared by Dr. Goldsmith comparing, among other things, the monthly salary range of Group Health's executives with those in like positions. The trial court admitted this exhibit solely as a basis for Dr. Goldsmith's expert opinion and not as proof of the matter asserted. Group Health also offered a Retrospective Compensation Study compiled by Dr. Goldsmith for the 11 "nonexecutive" positions at Group Health immediately below the positions he deemed executive. This also was admitted into evidence.

At the conclusion of Dr. Goldsmith's testimony, the trial court denied the Department's motion for dismissal. The Department then published the depositions of 12 lower–level Group Health employees. With the exception of one person these depositions were from employees not considered to be executive by Dr. Goldsmith. The Department asserted that these employees were also executives, and

that therefore, Group Health must prove that they also met statutory requirements. On rebuttal, Dr. Goldsmith extended his analysis beyond the 8 positions he identified at Group Health as executive, to include the 11 positions immediately below. Dr. Goldsmith testified that these Group Health employees were paid salaries or compensation comparable to employees in like positions in public service.

## QUANTUM OF PROOF REQUIRED

■ This court's role as to questions of fact is to determine whether substantial evidence supports the trial court's findings and whether those findings support the conclusions of law and the judgment. The trial court's findings will not be disturbed on appeal if supported by substantial evidence. *State v. Black,* 100 Wn.2d 793, 802, 676 P.2d 963 (1984); *Ridgeview Properties v. Starbuck,* 96 Wn.2d 716, 719, 638 P.2d 1231 (1982). Substantial evidence is evidence in sufficient quantum to persuade a fair–minded person of the truth of the declared premise. *Ridgeview* at 719; *accord, Nichols Hills Bank v. McCool,* 104 Wn.2d 78, 82, 701 P.2d 1114 (1985). We conclude that Group Health presented evidence in sufficient quantum to persuade a fair–minded person that its executives are paid salaries comparable to those holding "like positions within the public service of the state" and that Group Health is entitled to the deduction provided by RCW 82.04.4297.

## ADMISSION OF EXPERT TESTIMONY

■ The Department contends that the issue is whether the opinion of the expert witness is sufficient to establish the facts in issue. ER 702 reads:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

There is no dispute about Dr. Goldsmith's qualifications as

an expert. To be ascertained is whether his testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue". The trial court has discretion as to the admissibility of expert testimony. *State v. Fagundes,* 26 Wn. App. 477, 483, 614 P.2d 198, 625 P.2d 179, *review denied,* 94 Wn.2d 1014 (1980). "If the reasons for admitting or excluding the opinion evidence are 'fairly debatable', the trial court's exercise of discretion will not be reversed on appeal." *Walker v. Bangs,* 92 Wn.2d 854, 858, 601 P.2d 1279 (1979). The trial court determined that Dr. Goldsmith's testimony would assist it. Nothing contrary to that determination was presented by the Department.

■ The data Dr. Goldsmith relied upon in forming his opinion is of the type reasonably relied upon by experts in his field. ER 703 reads:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

The trial court has discretion as to the trustworthiness of the expert's underlying information.

> In order to rely upon facts which are inadmissible in evidence, it . . . must be shown that experts in the particular field of competence, in general, reasonably rely upon such material for purposes other than giving testimony in litigation. . . .
>
> Although Rule 703 refers to inadmissible evidence in general, its most common application will be to permit an expert opinion based upon hearsay.
>
> . . .
>
> The phrase "reasonably relied upon" gives the court a measure of discretion in determining whether the underlying information is sufficiently trustworthy to serve as the basis of the expert's opinion. The determination is a preliminary factual issue determined in accordance with ER 104.

(Footnotes omitted.) 5A K. Tegland, Wash. Prac. § 306, at

75, 76, 78–79 (1982 & Supp. 1985).

Testimony by the expert which embraces the ultimate issue is allowed. *Batten v. South Seattle Water Co.,* 65 Wn.2d 547, 551, 398 P.2d 719 (1965); *Gerberg v. Crosby,* 52 Wn.2d 792, 796, 329 P.2d 184 (1958). The trial court may always reject expert testimony in whole or in part. *Brewer v. Copeland,* 86 Wn.2d 58, 74, 542 P.2d 445 (1975). As noted in *Gerberg v. Crosby, supra* at 799, quoting *Grismore v. Consolidated Prods. Co.,* 232 Iowa 328, 5 N.W.2d 646 (1942):

"Jurors and witnesses have separate and distinct functions. It is the duty of the jury to decide issues of fact. A witness could not usurp that function or invade the province of the jury, by his opinion, if he wished. It may accept it wholly, or in part, or reject it in toto. If the opinion meets with its approval it should accept it. The purpose of court trials is to ascertain the truth and rightness of the matters in issue, and the purpose of expert–opinion testimony is to instruct and aid the jury in ascertaining that truth, whether it be the ultimate fact or some minor evidential fact."

The fact that the trial court allowed Dr. Goldsmith to testify to an ultimate issue is permissible, under ER 704, which reads:

Testimony in the form of an opinion or inferences otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

An expert opinion may be given without prior disclosure of the basis for that opinion. ER 705 reads:

The expert may testify in terms of opinion or inference and give his reasons therefor without prior disclosure of the underlying facts or data, unless the judge requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross examination.

The trial court may allow the admission of otherwise hearsay evidence and inadmissible facts for the purpose of showing the basis of the expert's opinion. *State v. Wineberg,* 74 Wn.2d 372, 384, 444 P.2d 787 (1968). The admis-

sion of these facts, however, is not proof of them.

> [I]f an expert states the ground upon which his opinion is based, his explanation is not proof of the facts which he says he took into consideration: Wigmore on Evidence, 3rd ed., § 655. His explanation merely discloses the basis of his opinion in substantially the same manner as if he had answered a hypothetical question. It is an illustration of the kind of evidence which can serve multiple purposes and is admitted for a single, limited purpose only.

*Wineberg*, at 382 (quoting *State Hwy. Comm'n v. Parker*, 225 Or. 143, 160, 357 P.2d 548 (1960)). *See also* 5A K. Tegland, Wash. Prac. § 312 (1982 & Supp. 1985). *Prentice Packing & Storage Co. v. United Pac. Ins. Co.*, 5 Wn.2d 144, 106 P.2d 314 (1940) reversed a judgment in favor of the plaintiff. Regarding the sufficiency of plaintiff's testimony the court stated at page 164:

> [Plaintiff's] case rests ultimately upon expert opinion. But the opinions of expert witnesses are of no weight unless founded upon facts in the case. The law demands that verdicts rest upon testimony, and not upon conjecture and speculation.

*See also Theonnes v. Hazen*, 37 Wn. App. 644, 649, 681 P.2d 1284 (1984). The basis of Dr. Goldsmith's opinion was clearly established. His opinion did not rely on conjecture and speculation. Further, the Department had every opportunity to challenge the basis of the expert's opinion by cross examination or by presenting evidence or expert testimony of its own. Dr. Goldsmith's testimony is entitled to full weight as it is founded on the facts in the case.

The trial court properly admitted Dr. Goldsmith's testimony: (a) He was qualified as an expert; (b) the admission of his testimony was a matter of discretion for the trial court; (c) his expert testimony assisted the trier of fact; (d) he testified from an exhibited knowledge of the factual matters; and (e) the exhibits admitted corroborated the basis of his testimony. The real question here is whether the salaries actually paid for like services rendered to Group Health or to public sector employers were in fact

comparable. As the trial court noted:

> The purpose, I have no doubt, of [RCW 82.04.431(1)] (b) here is to make certain that they are truly a nonprofit corporation in the health field and that [executives] are paid for their actual services rendered and that those salaries are commensurate with other salaries of like positions in the public service of the state.

Report of Proceedings, at 211–12.

The evidence clearly indicates that Group Health is a nonprofit health organization, that Group Health's executives are paid for actual services rendered and that the executive salaries paid by Group Health are commensurate with like positions in the public services of the state. The verdict rests on substantial testimony. Group Health is entitled to the deduction provided by RCW 82.04.4297.

### STATUTORY INTERPRETATION

■ Legislative intent is ascertained from the statutory text as a whole, interpreted in terms of the general object and purpose of the legislation. *Strenge v. Clarke,* 89 Wn.2d 23, 29, 569 P.2d 60 (1977); *State v. Sponburgh,* 84 Wn.2d 203, 210, 525 P.2d 238 (1974). The words of a statute, unless otherwise defined, should be given their usual and ordinary, everyday meaning. *Strenge,* at 29; *New York Life Ins. Co. v. Jones,* 86 Wn.2d 44, 47, 541 P.2d 989 (1975). If a tax statute is ambiguous the statute must be construed most strongly against the taxing authority. *Puyallup v. Pacific N.W. Bell Tel. Co.,* 98 Wn.2d 443, 448, 656 P.2d 1035 (1982); *Department of Rev. v. Hoppe,* 82 Wn.2d 549, 512 P.2d 1094 (1973); *Gould v. Gould,* 245 U.S. 151, 62 L. Ed. 211, 38 S. Ct. 53 (1917). Regarding exemptions and deductions *Group Health Coop. of Puget Sound, Inc. v. State Tax Comm'n,* 72 Wn.2d 422, 429, 433 P.2d 201 (1967) states:

> In connection with each, the burden of showing qualification for the tax benefit afforded likewise rests with the taxpayer. And, statutes which provide for either are, in case of doubt or ambiguity, to be construed strictly,

though fairly and in keeping with the ordinary meaning of their language, against the taxpayer.

ACCURACY AND SCOPE OF DEFINITIONS

The Department argues that the trial court did not construe "executive" in its usual and ordinary meaning, but rather improperly substituted Dr. Goldsmith's more limited definition as reflected in finding of fact 3.[2] Group Health argues that this finding is correct when RCW 82.04.431 is taken as a whole. In subsection (1)(b) of that statute "executives" are coupled with "officers". This evinces the Legislature's intent to focus on those in top–level positions having the greatest managerial authority and responsibility.

The trial court's adoption of Dr. Goldsmith's definition was proper. Group Health provided sufficient evidence showing that lower–level positions, whether or not executive positions, also meet the statutory requirements.

■ The trial court also properly construed "like positions within the public service of the state" to compare with executives in various fields of public service. The Legislature could have restricted the comparison to the medical field had the Legislature desired. The term "state" is not capitalized in the statutory text. When the term "state" is used in the Rules of Civil Procedure it is all inclusive and embraces not only the State but its political subdivisions. *State v. Durham,* 87 Wn.2d 206, 211, 550 P.2d 685 (1976); *County of Spokane v. Gifford,* 9 Wn. App. 541, 513 P.2d 301 (1973). This same construction of the term "state" by the trial court was appropriate here.

The remaining claims were properly decided on summary judgment as neither presented material issues of fact.

---

[2]Finding of fact 3 reads:

"The executives of the Cooperative are the employees of the Cooperative reporting directly to its Board of Trustees or to its Chief Executive Officer. During the period for which a refund is claimed, the executives of the Cooperative were its Executive, for Finance Administration, for Health Care, Chief of Medical Staff, Regional Administrator, General Counsel, Director of Policy and Planning and Director of Public and Employee Relations, a total of eight executive positions." These eight executive positions are those which Dr. Goldsmith determined were executive.

RCW 82.04.120 and WAC 458–20–136

THE BUSINESS AND OCCUPATION TAX AND THE
EXCLUSION OF INCIDENTAL ACTIVITIES

RCW 82.04.120 provides the following definition:

"To manufacture" embraces all activities of a commercial or industrial nature wherein labor or skill is applied, by hand or machinery, to materials so that as a result thereof a new, different or useful substance or article of tangible personal property is produced for sale or commercial or industrial use, and shall include the production or fabrication of special made or custom made articles.

"To manufacture" shall not include activities which consist of cutting, grading, or ice glazing seafood which has been cooked, frozen or canned outside this state.

This definition is supplemented by former WAC 458–20–136 (Rule 136) which read in pertinent part:[3]

It means the business of producing articles for sale, or for commercial or industrial use from raw materials or prepared materials by giving these matters new forms, qualities, properties, or combinations. It includes such activities as making, fabricating, processing, refining, mixing, slaughtering, packing, curing, aging, canning, etc. It includes also the preparing, packaging and freezing of fresh fruits, vegetables, fish, meats and other food products, the making of custom made suits, dresses, and coats, and also awnings, blinds, boats, curtains, draperies, rugs, and tanks, and other articles constructed or made to order. It also includes the generation or production of electrical energy for resale or consumption outside the state.

. . .

*The term "to manufacture" does not include activities which are merely incidental to nonmanufacturing activities.* Thus, the following do not constitute manufacturing: Washing and screening of coal, or the bucking and yarding of logs, by the extractors thereof; pasteurizing and bottling of milk by a dairy; cooking and serving of food by a restaurant; the mere cleaning and freezing of

---

[3]Rule 136 has been amended to eliminate the paragraph pertaining to "activities which are merely incidental to nonmanufacturing activities". We consider the rule as it existed at the pertinent time in question.

whole fish; repairing and reconditioning of tangible personal property for others, etc. Likewise, neither an artist, a *portrait photographer, nor a prescription pharmacist is a manufacturer.*

(Italics ours.)

Group Health asserts that the Department must give Rule 136 the full force and effect of law pursuant to RCW 82.32.300. It argues that Rule 136 authorizes a de minimis approach, as used in *Otis Elevator Co. v. United States,* 618 F.2d 712 (Ct. Cl. 1980). *Otis* involved Otis Elevator's status as a Western Hemisphere trade corporation within the meaning of Internal Revenue Code section 921, the dispositive issue being the extent to which Otis Elevator was a corporation all of whose business, other than incidental purchases, was conducted in Western Hemisphere countries. Regarding "incidental purchases" the court in *Otis* states at pages 718–19:

> [P]laintiff challenges the correctness of the Treas.Reg. § 1.921–1(a)(1) definition of "incidental purchases." Rather than meaning purchases which are "(i) minor in relation to the entire business or (ii) nonrecurring or unusual in character," plaintiff contends that "incidental purchases" as used in section 921 should be defined as "purchases incident to the conduct of the business." In plaintiff's view, purchases made outside the Western Hemisphere, if incident to the conduct of its business, must regardless of the level of such purchases always be considered to be "incidental purchases." Since Treas.Reg. § 1.921–1(a)(1) specifically rejects plaintiff's definition, we could agree with plaintiff only if we were to hold the regulation invalid to the extent it defines the phrase "incidental purchases." This we decline to do.
>
> While "incidental purchases" is susceptible to either plaintiff's or the regulation's definition, the definition adopted by Treas.Reg. § 1.921–1(a)(1) is a reasonable one and is consistent with section 921. Since "Treasury regulations must be sustained unless unreasonable and plainly inconsistent with the revenue statutes," we therefore uphold the validity of the definition adopted by the regulation.

(Citations omitted.)

■ The de minimis approach used in *Otis* involved a percentage comparison of the purchases of goods manufactured outside the Western Hemisphere to the total gross purchase receipts. The *Otis* court deemed 15 percent of total gross receipts incidental.

> We accordingly hold that in determining whether a corporation's purchases made outside the Western Hemisphere are "purchases * * * which are * * * minor in relation to the entire business," as this phrase is used in this regulation, the correct approach is to compare the dollar value of a corporation's purchases made outside the Western Hemisphere in a given year with its gross receipts in that year. If this percentage is sufficiently small, such purchases will be "minor in relation to the entire business." . . .

*Otis*, at 724–25. The carpentry and print activities of Group Health involve less than .1 percent of the total expenses of Group Health. This fact alone does not suffice, however, to show that the carpentry and print activities in question were incidental.

The *Otis* court looked to Treasury regulations for the definition of "incidental purchases." The WAC regulations do not define "incidental manufacturing" for our purposes. However, Rule 136 speaks of the "[w]ashing and screening of coal . . . pasteurizing and bottling of milk . . . repairing and reconditioning of tangible personal property for others . . ." The thrust of Rule 136 is *qualitative* rather than quantitative. The text examples of Rule 136 clearly support a qualitative approach. The quantitative de minimis approach used in *Otis* is inappropriate.

Manufacturing is defined as an activity which produces a substance or article either "for sale or commercial use or industrial use". RCW 82.04.120. The relevant test involves a comparison of the product or substance which emerges from that which was initially submitted to treatment or processing.

*McDonnell & McDonnell v. State*, 62 Wn.2d 553, 557, 383 P.2d 905 (1963) states:

[C]onsideration should be given to the following factors: among others, changes in form, quality, properties (such changes may be chemical, physical, and/or functional in nature), enhancement in value, the extent and the kind of processing involved, differences in demand, et cetera, which may be indicative of the existence of a "new, different, or useful substance."

*See also Bornstein Sea Foods, Inc. v. State,* 60 Wn.2d 169, 175, 373 P.2d 483 (1962).

The carpentry and print activities of Group Health, albeit minimal, constitute manufacturing even though the goods were produced for their own use and not for sale. These activities produce new, different and useful products. Thus the carpentry and print work is within the definition of manufacture provided by RCW 82.04.120. Rule 136 does not exempt from taxation activities which satisfy this definition. The Department's assessment of business and occupation and use taxes on these activities was proper.

REVERSAL OF AUDITOR; DEPARTMENTAL ESTOPPEL

In an audit covering April 1, 1972 to September 30, 1975 a Department examiner verified a nonprofit hospital deduction, provided by RCW 82.04.4289,[4] taken by Group Health. In a later audit another examiner reversed the Department's position and denied Group Health this deduction. The Department retroactively assessed the taxes which had not been paid, notifying Group Health of this reversal in position on July 1, 1980. Group Health paid but

---

[4]RCW 82.04.4289 reads:

"In computing tax there may be deducted from the measure of tax amounts derived as compensation for services rendered to patients or from sales of prescription drugs as defined in RCW 82.08.0281 furnished as an integral part of services rendered to patients by a hospital, as defined in chapter 70.41 RCW, which is operated as a nonprofit corporation, a kidney dialysis facility operated as a nonprofit corporation, whether or not operated in connection with a hospital, nursing homes and homes for unwed mothers operated as religious or charitable organizations, but only if no part of the net earnings received by such an institution inures directly or indirectly, to any person other than the institution entitled to deduction hereunder. In no event shall any such deduction be allowed, unless the hospital building is entitled to exemption from taxation under the property tax laws of this state."

challenged this assessment. Thereafter, the Department refunded tax amounts assessed through June 30, 1980, but refused to refund tax amounts assessed after July 1, 1980. The Department did not adopt the change of position as an "official position" until May 6, 1981. Group Health argues that it is entitled to a refund for taxes paid between July 1, 1980, and May 6, 1981. We disagree.

 "The doctrine of estoppel will not be lightly invoked against the state to deprive it of the power to collect taxes." *Kitsap–Mason Dairymen's Ass'n v. State Tax Comm'n,* 77 Wn.2d 812, 818, 467 P.2d 312 (1970). The elements of estoppel are stated as follows:

> Three elements must be present to create an estoppel: (1) an admission, statement, or act inconsistent with the claim afterwards asserted, (2) action by the other party on the faith of such admission, statement, or act, and (3) injury to such other party resulting from allowing the first party to contradict or repudiate such admission, statement, or act.

*Harbor Air Serv., Inc. v. Board of Tax Appeals,* 88 Wn.2d 359, 366–67, 560 P.2d 1145 (1977). Group Health's reliance on the prechange position was not justified. Group Health was not entitled to rely on the prechange position after July 1, 1980, the date it received notification of the reversal in position. This approach allows for certainty between the parties and assures that the taxpayer has received notice. To hold as Group Health argues would make the date upon which a taxpayer could rely upon an examiner's position depend on factors such as whether the matter was appealed. Additionally, there would be no assurance that the taxpayer would receive notice. The date of notification, not the date the Department officially adopts a change of position, is the crucial date for purposes of estoppel. Reliance on the initial Department position by Group Health after July 1, 1980 was not justified; estoppel is inappropriate.

We affirm the trial court's ruling that Group Health is a health or social welfare organization entitled to take the

deduction pursuant to RCW 82.04.4297. We also affirm the trial court's rulings in favor of the Department on the partial summary judgment motions.

DOLLIVER, C.J., and UTTER, BRACHTENBACH, DORE, PEARSON, ANDERSEN, GOODLOE, and DURHAM, JJ., concur.