**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clientsidereports/.

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| THE STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>LEON CARIL, II,<br><br>Appellant. | No. 82334-5-I<br><br>DIVISION ONE<br><br>PUBLISHED OPINION |

BIRK, J. — Leon Caril, II, appeals his conviction and sentence for second degree murder. He asserts he was in a state of compromised mental health when he stabbed and killed a person. At trial, Caril, who suffers from paranoid schizophrenia, called an expert psychologist who testified that Caril lacked the capacity to form criminal intent at the time of the incident. The trial court allowed this testimony, but prohibited Caril's expert witness from testifying to hearsay statements from another psychologist's report that the expert relied on, because the excluded statements concerned the collateral issues of Caril's competency to stand trial and potential future need for civil commitment. We conclude the trial court did not abuse its discretion by excluding this evidence, and Caril's Sixth Amendment right to present a defense was not violated. The State concedes several errors that require resentencing. We affirm Caril's conviction, vacate his sentence, and remand for resentencing.

No. 82334-5-I/2

I

A

During the night of June 22-23, 2017, Russell Ross, Tammy Nguyen, and Andrew Pimenthal spent part of the night with a group of friends in an evening out. In the early morning hours, they obtained take-out meals and sat on the curb outside the restaurant to eat as they conversed. From across the street, an individual shouted, "[S]hut the fuck up," and threw a two-liter soda bottle in their direction, which landed by their feet. Ross shouted back that throwing the bottle was a "good way to get your ass kicked."

Ross observed the individual, later identified as Caril, start across the street towards the group brandishing a knife. Ross told everyone to "run" and that the approaching individual had a knife. Nguyen and Ross withdrew, but Pimenthal was not able to do so in time. While running away, Ross saw Caril stab Pimenthal. Nguyen saw Caril "punch" Pimenthal three times in the chest. Jaapir Hussen, who observed these events from his car nearby, exited his vehicle and shouted at Caril asking if he was "crazy" and "why" he stabbed Pimenthal. Caril asked Hussen if he "want[ed] some too." Pimenthal died from his injuries.

Ross summoned the police. Caril walked back across the street. Carson Williams was informed by people in the area that Caril was the one who stabbed Pimenthal, Williams started following Caril, and he saw Caril stuff something into a suitcase. Carson dialed 911, informing Caril that he was doing so. Caril replied, "[D]o you know who I am. I am the man who just stabbed someone." Police

responding to the 911 call located Caril. Officer Zachary Pendt asked Caril if he had a knife, which Caril confirmed was in his bag. Caril complied with the responding officers' requests and was cooperative. The officers did not find any medication among Caril's belongings. The State charged Caril with murder in the second degree, and later added murder in the first degree by amended information.

B

In 2010, 2011, 2012, 2015, and 2016, Caril was diagnosed with paranoid schizophrenia. Before the June 23, 2017 incident, Caril had a long-term housing placement and he had long-term outpatient treatment through Sound Mental Health. On June 16, 2017, Caril lost his housing after engaging in an altercation with another resident. And he lost his outpatient treatment services on July 12, 2017 due to his arrest and incarceration related to Pimenthal's murder.

On October 3, 2018, the superior court entered an order finding Caril incompetent and committing him to Western State Hospital (WSH) for a restoration period of 90 days. On October 30, 2018, Daniel Peredes-Ruiz, MD requested that the State seek judicial authority for WSH to treat Caril with antipsychotic medications involuntarily, since he had been unwilling to actively participate in treatment. In a competency assessment completed by Brandi Lane, PsyD, which was attached to the request letter, Dr. Lane concluded that Caril lacked the capacity to assist in his defense with a reasonable degree of rational understanding. Additionally, Caril was said to have ongoing delusional thinking,

disorganized thought process, grandiose thinking, and poor judgment. On February 7, 2019, the superior court entered an order granting the State's motion for involuntary medication for maintenance of competency.

On January 10, 2019, Jenna Tomei, PhD, completed a competency evaluation report of Caril. In her report, Dr. Tomei opined that Caril met diagnostic criteria for unspecified schizophrenia spectrum and other psychotic disorder and had the capacity to understand the nature of the proceedings against him and to assist in his own defense. Dr. Tomei's report stated that previously observed symptoms appeared to be well managed with Caril's then current medication regimen. Before the court order allowing for Caril to be involuntarily medicated, Caril had been described as "resistant," "guarded," "isolative," "withdrawn," and "suspicious" while at WSH. Additionally, Dr. Tomei's report noted that before being involuntarily medicated, Caril had been involved in a physical altercation and had yelled at others in competency restoration groups.

Dr. Tomei's report contrasted these characteristics to those observed after Caril was involuntarily medicated. The report described Caril as appearing to be more reality-based compared to his prior evaluation with no overt delusional thought processes. At the end of the report, Dr. Tomei stated, "If Mr. Caril were to discontinue his prescribed medication, he would likely decompensate. In such an event, he may or may not continue to present with the requisite capacities to proceed." Dr. Tomei concluded the report with an "RCW 71.05" (behavioral health detention) recommendation noting Caril "exhibited aggression towards others

4

during times of decompensation." It stated a designated crisis responder (DCR) would be required to assess Caril for commitment if there was a change in his "custodial situation."

On April 17, 2019, the superior court entered an order finding Caril competent to proceed to trial.

C

After the State rested its case-in-chief, Caril called Paul Spizman, PsyD as a defense expert. Dr. Spizman is a licensed forensic psychologist in Washington. Dr. Spizman has experience working with individuals who suffer from schizophrenia. While explaining general characteristics of schizophrenia, Dr. Spizman described it as a manageable mental illness, as opposed to a curable one, as some cases may go into "a type of remission." Dr. Spizman posited two hypothetical patients suffering from schizophrenia to illustrate the ebb and flow in severity of symptoms: a patient who is homeless and engaging in substance abuse would be under great stress and likely show more symptoms compared to one who is medicated, living in a stable environment, and with less stress, who may demonstrate relatively minimal symptoms. Dr. Spizman testified that medication is the primary method for treating schizophrenia. Dr. Spizman testified that a person suffering from schizophrenia who is taking medication is statistically more likely to have a reduction in or not experience any symptoms. Dr. Spizman stated that on many occasions, symptoms of paranoid schizophrenia are triggered from environmental factors, such as a car driving by one's house. He testified that "[f]or

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

a person who suffers from paranoid schizophrenia, and is not taking their or may not be taking their prescribed medications, . . . there [is] concern that they could act aggressively." When asked about what can trigger aggression from a person suffering from paranoid schizophrenia, Dr. Spizman testified that the trigger could be fairly benign stimuli, such as someone walking down the street talking on a cellphone or a group of people having a general conversation.

Dr. Spizman diagnosed Caril with schizophrenia and testified that he suffers from paranoid schizophrenia. He testified to his opinions specific to Caril and the June 23, 2017 incident. Dr. Spizman explained he formed his opinions after reviewing police reports and associated witness accounts of that incident, written materials Caril sent his attorneys, two interviews with Caril, Caril's mental health records, and Dr. Tomei's competency evaluation report. Dr. Spizman testified that Caril's delusions were the most prominent symptom on the morning of the incident. He stated that at the time of the incident, Caril was interpreting information around him as being directed toward him and believed Pimenthal and his friends were making statements toward and about him. Dr. Spizman testified that Caril said he did not know right from wrong at the time of the incident. And Caril had reported to Dr. Spizman that Caril consumed approximately half a gallon of vodka from 11:00 p.m. to 1:00 a.m. Dr. Spizman opined that Caril's mental illness impaired his ability to form premeditated intent to kill Pimenthal.

Caril's counsel questioned Dr. Spizman about Dr. Tomei's report and whether it mentioned "what would happen if Caril decompensated." Dr. Spizman

answered he did not recall. Defense counsel sought to point Dr. Spizman to the disputed section of Dr. Tomei's report when the State objected on hearsay grounds.

In an offer of proof outside the presence of the jury, defense counsel indicated he had planned to ask Dr. Spizman to relate statements from the following paragraphs in Dr. Tomei's report:

> It should be noted that the current evaluation took place during a time when Mr. Caril was compliant with his psychiatric medication. If Mr. Caril were to discontinue his prescribed medication, he would likely decompensate. In such an event, he may or may not continue to present with the requisite capacities to proceed.
>
> RCW 71.05 RECOMMENDATION
> Based upon the information referred to in this report, there is no evidence to indicate Mr. Caril presents an imminent risk of danger to himself or others. However, records indicate that Mr. Caril has exhibited aggression towards others during times of decompensation. Further, if he were to decompensate his symptoms of psychosis would likely interfere with his ability to carry out activities of daily living and provide for his basic needs of health and safety. Therefore, an evaluation by a DCR does appear necessary should Mr. Caril's custodial situation change.

(Boldface omitted) (emphasis in original). Dr. Spizman testified that he relied on these statements by Dr. Tomei in arriving at his opinions.

The trial court excluded the statements in Dr. Tomei's report on the basis that while relevant, their probative value was substantially outweighed by the danger of unfair prejudice to both parties, and the risk that they could cause confusion or mislead the jury. The trial court pointed to the difference between an evaluation of competency to stand trial and dangerousness in a potential civil

7

commitment proceeding versus an evaluation of capacity to form intent at the time of the incident. The trial court denied Caril's later motion for reconsideration.

On count I, Caril was acquitted of first degree murder, but the jury found him guilty of the lesser included crime of second degree murder (intentional murder) with a deadly weapon. Caril was found guilty of second degree murder (felony murder) with a deadly weapon on count II. The trial court entered an order vacating count II for sentencing only.

At sentencing, based on Caril's four convictions for robbery in the second degree from 1998 and a conviction for attempted robbery in the first degree in 2002, the trial court found this was his sixth "most serious offense" making Caril a persistent offender. The trial court sentenced Caril to life in prison without the possibility of parole. The judgment and sentence contained references to both count I and count II. Caril appeals.

II

Caril contends that the trial court violated his right to present a defense under the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington State Constitution by prohibiting Dr. Spizman from testifying to the excluded statements in Dr. Tomei's report. Caril alleges that the excluded testimony was highly probative and integral to his defense.

A

A defendant has a constitutional right to present a defense. U.S. CONST. amends. VI, XIV; WASH. CONST. art. I, § 22. This right is not absolute. It may, "'in

appropriate cases, bow to accommodate other legitimate interests in the criminal trial process,'" including the exclusion of evidence considered irrelevant or otherwise inadmissible. State v. Giles, 196 Wn. App. 745, 756-57, 385 P.3d 204 (2016) (quoting Chambers v. Mississippi, 410 U.S. 284, 295, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973)).

In analyzing whether a trial court's evidentiary decision violated a defendant's Sixth Amendment right to present a defense, we first review the court's evidentiary ruling for an abuse of discretion. State v. Jennings, 199 Wn.2d 53, 58, 502 P.3d 1255 (2022); State v. Arndt, 194 Wn.2d 784, 797-98, 453 P.3d 696 (2019); State v. Markovich, 19 Wn. App. 2d 157, 167, 492 P.3d 206 (2021), review denied, 198 Wn.2d 1036, 501 P.3d 141 (2022). If we conclude that the evidentiary ruling was not an abuse of discretion, we then consider de novo whether the exclusion of evidence violated the defendant's constitutional right to present a defense. Jennings, 199 Wn.2d at 59.

B

Evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. ER 403. We review a trial court's ER 403 admissibility ruling for abuse of discretion. State v. Rice, 48 Wash. App. 7, 11, 737 P.2d 726 (1987). A trial court abuses its discretion if no reasonable person would take the view adopted by the trial court. Jennings, 199 Wn.2d at 59.

An expert witness is permitted to base an opinion on "facts or data" that are not admissible in evidence if the facts or data are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." ER 703. When a party seeks to introduce otherwise inadmissible facts or data through an expert witness who has relied on them, the trial court has discretion to determine the extent to which the expert may relate the inadmissible information to the trier of fact. See ER 705. The trial court has discretion to exclude inadmissible information on which an expert has relied to prevent an expert's opportunity to explain the basis for an opinion from becoming merely "a mechanism for admitting otherwise inadmissible evidence" or "to avoid the rules for admissibility of evidence." State v. Anderson, 44 Wn. App. 644, 652, 723 P.2d 464 (1986); State v. Martinez, 78 Wn. App. 870, 879, 899 P.2d 1302 (1995).

The evidence rules contemplate that an opposing party may inquire into the facts or data on which an expert has relied when cross-examining the expert. ER 705. At other times, as here, the party offering the expert may seek to ask the expert on direct examination to relay inadmissible facts or data on which the expert has relied in forming opinions. When inadmissible facts or data are offered under ER 705, the trial court should "determine under ER 403 whether to allow disclosure of inadmissible underlying facts based upon whether the probative value of this information outweighs its prejudicial or possibly misleading effects." Martinez, 78 Wn. App. at 879.

10

An expert's testimony disclosing inadmissible facts or data to explain the expert's opinion "is not proof of them" as substantive evidence. Grp. Health Coop. of Puget Sound, Inc. v. Dep't of Revenue, 106 Wn.2d 391, 399-400, 722 P.2d 787 (1986); State v. Wineberg, 74 Wn.2d 372, 381-82, 444 P.2d 787 (1968). An expert testifying to otherwise inadmissible facts or data under ER 705 may do so "only for the purpose of explaining the basis for [the expert's] opinion." In re Det. of Marshall, 156 Wn.2d 150, 163, 125 P.3d 111 (2005). When the trial court allows an expert to testify to otherwise inadmissible facts or data for nonsubstantive purposes to show the basis of the expert's opinion, the trial court should give an appropriate limiting instruction. In re Det. of Coe, 175 Wn.2d 482, 513-14, 286 P.3d 29 (2012); Marshall, 156 Wn.2d at 163; In re Det. of Leck, 180 Wn. App. 492, 511, 513, 334 P.3d 1109 (2014) (limiting instruction that inadmissible information was to be considered "'only in deciding what credibility and weight'" to give expert's opinion and not as evidence that the information "'is true or that the events described actually occurred'").

Here, the trial court found the evidence to be relevant, but excluded it because its probative value was substantially outweighed by the danger of unfair prejudice to both parties, it could mislead the jury and confuse the issues. Dr. Tomei's January 10, 2019 competency evaluation report included a description of Caril's then current mental status, an opinion on Caril's competency to proceed to trial, discussion of whether Caril's competency was restorable and what steps would be appropriate to achieve restoration, and discussion of whether Caril

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

should be evaluated by a DCR under chapter 71.05 RCW. This report sought to provide information to the trial court related to either the resolution of Caril's criminal case, his future competency and ability to participate in his defense, or assessing civil commitment if his custodial situation changes. At no point in her report did Dr. Tomei evaluate Caril to determine his competency or state of mind on the date of the incident.

Had the statements from Dr. Tomei's report been admitted, the State would likely have cross-examined Dr. Spizman on the context of those statements in Dr. Tomei's report. Such testimony, as the trial court pointed out, would have been likely to reveal Caril's risk of dangerousness in connection with Dr. Tomei's recommendation for an evaluation by a DCR should Caril's custodial situation change. The jury, however, was charged with determining, relevant to this discussion, Caril's state of mind when he stabbed and killed Pimenthal. Hearing about information and a recommendation focused on Caril's competency to assist with his defense and trial and potential changes to his "custodial situation" could confuse the jury or divert the jury from the issues it was charged with deciding. Moreover, given that Dr. Tomei did not testify at trial, it would be speculative whether she would support the implied use of her opinions as data relevant to Caril's capacity to form intent at the time of the attack.

The trial court acted within its discretion in excluding the statements from Dr. Tomei's report under ER 403.

C

Because we conclude that the trial court's evidentiary ruling was not an abuse of discretion, we next consider de novo whether the exclusion of evidence violated the Sixth Amendment. Jennings, 199 Wn.2d at 59; Arndt, 194 Wn.2d at 797-98; Markovich, 19 Wn. App. 2d at 167.

Under Washington's test for evaluating whether the exclusion of evidence violates the Sixth Amendment, we first consider whether the excluded evidence was at least minimally relevant. State v. Orn, 197 Wn.2d 343, 353, 482 P.2d 913 (2021); State v. Hudlow, 99 Wn.2d 1, 15, 659 P.2d 514 (1983). This is because a defendant has no constitutional right to present irrelevant evidence. State v. Jones, 168 Wn.2d 713, 720, 230 P.3d 576 (2010); Markovich, 19 Wn. App. 2d at 167. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. If the evidence is relevant, then the State must demonstrate that the evidence was so prejudicial as to disrupt the fairness of the fact-finding process at trial, such that the State's interest in excluding the prejudicial matter outweighs the defendant's right to produce relevant evidence. See Jennings, 199 Wn.2d at 63; Orn, 197 Wn.2d at 353; Hudlow, 99 Wn.2d at 15-16; Markovich, 19 Wn. App. 2d at 167-68.

There is no dispute that the excluded hearsay statements from Dr. Tomei's report were at least minimally relevant on the issue of the basis for Dr. Spizman's opinions. However, as alluded to above and discussed further below, because the statements were admissible for only the limited purpose of showing the basis for

13

Dr. Spizman's opinions—the substance of which the jury heard in full—the balance in this case tips strongly in favor of the State's interest in excluding this evidence due to its potential confusing effect and against the defendant's interest in marginally bolstering Dr. Spizman's methodology.

For highly probative evidence, "it appears no state interest can be compelling enough to preclude its introduction consistent with the Sixth Amendment and Const. art. 1 § 22." Hudlow, 99 Wn.2d at 16. The greater the probative value of the excluded evidence, the more likely a court will find a constitutional violation, such as in cases where a ruling excluded a defendant's "entire defense." Jones, 168 Wn.2d at 721. In Jones, the court found a Sixth Amendment violation where the defendant was barred from testifying that the victim had engaged in a many-hour course of conduct involving significant drug use during which the victim engaged consensually in the conduct on which the charges against the defendant were based. Id. at 717-18, 721. Cf. Holmes v. South Carolina, 547 U.S. 319, 323, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006) (exclusion of evidence that another person had committed the crime charged); Crane v. Kentucky, 476 U.S. 683, 691, 106 S. Ct. 2142, 90 L. Ed. 2d 636 (1986) (exclusion of evidence of the physical circumstances that yielded a confession challenged as unreliable); Chambers, 410 U.S. at 292-93, 297-98 (exclusion of testimony by three witnesses that another person had admitted committing the crime charged, together with barring cross-examination of that person); Washington v. Texas, 388 U.S. 14, 16, 23, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967)

(exclusion of witness who, the defendant asserted, would testify that the defendant had departed before a shooting). Similarly, the court found a constitutional violation where the trial court allowed only a limited, misleading inquiry into a witness's cooperation with the investigating police department. Orn, 197 Wn.2d at 358-59. The court reasoned that "the right to present evidence of a witness's bias is essential to the fundamental constitutional right of a criminal defendant to present a complete defense, which encompasses the right to confront and cross-examine adverse witnesses." Id. at 352.

The balance more often tips against a constitutional violation when a defendant asserts a right to present a defense violation based on evidentiary limitations imposed on a defense that is otherwise presented and developed. The trial court in Arndt imposed limitations on testimony from a certified arson investigator on how the State's expert determined the cause and origin of a house fire that resulted in a death. 194 Wn.2d at 790, 796. The Supreme Court concluded that (1) Arndt's proffered evidence was not excluded entirely and the investigator was able to testify at length to asserted deficiencies in the prosecution's fire investigation, and (2) Arndt was able to advance her defense theory without the excluded evidence. Id. at 813-14. Thus, Arndt's Sixth Amendment right to present a defense was not violated. Id. Cf. Jennings, 199 Wn.2d at 67 (excluding a toxicology report that showed the victim had methamphetamine in his system did not violate defendant's Sixth Amendment right to present a defense where defendant was able to present evidence of his

15

subjective fear and belief in the victim's intoxication); Markovich, 19 Wn. App. 2d at 163, 169 (excluding as speculative defense expert's opinions about possible effects of concussion on a substance-induced brain-functioning issue, where expert was permitted to testify about effects of intoxication).

Here, similar to Arndt and unlike Jones, the trial court did not completely bar Caril's defense of lack of intent or capacity by excluding the hearsay statements in Dr. Tomei's report. Instead, the trial court prohibited Caril from introducing two paragraphs taken from a report written in a different context, which would have been allowable only for the purpose of explaining Dr. Spizman's opinions—not for substantive purposes. Allowing the statements presented a risk to the State in having to cross-examine Dr. Spizman on the statements about decompensation from Dr. Tomei's report and lead the jury into the irrelevant issues of civil commitment and future dangerousness. Eliciting such testimony would risk misleading the jury or confusing the issues. Although the excluded evidence was relevant, Caril's need to present this testimony was minimal.

Moreover, because the evidence at issue was relevant for only a limited purpose, and not as substantive evidence, its probative value was low in comparison to the evidence at issue in cases finding a constitutional violation. Caril fails to cite any case in which a court found a constitutional violation based on the exclusion of substantively inadmissible evidence offered solely for the limited purpose to provide additional context for an expert opinion. Courts are permitted to "'exclude evidence that is repetitive . . ., only marginally relevant or

poses an undue risk of harassment, prejudice, [or] confusion of the issues.'" Holmes, 547 U.S. at 326-27 (alterations in original) (internal quotation marks omitted) (quoting Crane, 476 U.S. at 689-90). It is undisputed the hearsay statements in Dr. Tomei's report were not admissible as substantive evidence to show that the matters Dr. Tomei stated were true. In other words, it is undisputed the statements were not admissible to prove that it was true that when not taking medication Caril was in danger of experiencing worsening symptoms and exhibiting aggressive behavior towards others. When limited to the only proper purpose the evidence could serve, it provided, at most, "datapoint[s]" that Dr. Spizman considered in forming his opinions. To the extent the fact of Dr. Spizman's considering the report and its content could potentially enhance to some degree the credibility of his opinions, the excluded statements were only marginally relevant evidence that a court should balance against the State's interest in excluding the evidence.

We hold that the trial court did not violate Caril's constitutional right to present a defense by excluding the hearsay statements in Dr. Tomei's report, and we affirm Caril's conviction for second degree murder.

III

The State concedes that certain errors require resentencing.

First, based on four prior second degree robbery convictions, the trial court sentenced Caril as a persistent offender. See State v. Reynolds, 21 Wn. App. 2d 179, 187, 505 P.3d 1174 (2022) (explaining "persistent offender" designation);

17

RCW 9.94A.030(37) (defining "persistent offender"). However, under RCW 9.94A.647(1), effective July 25, 2021, Caril's four prior second degree robbery convictions may not be used to sentence Caril as a persistent offender. RCW 9.94A.647(1), (3). A sentencing court is required to grant a motion for relief from the original sentence if it finds that a current or past conviction for robbery in the second degree was used as a basis for a finding that the offender was a persistent offender. RCW 9.94A.647(1), (2). Therefore, the statute provides that Caril "must have a resentencing hearing." RCW 9.94A.647(1).

Second, Caril's offender score at the time of sentencing included a 1998 conviction for violating the Uniform Controlled Substances Act (VUCSA), chapter 69.50 RCW. State v. Blake held Washington's strict liability drug possession statute, RCW 69.50.4013(1), "violates the due process clauses of the state and federal constitutions and is void." 197 Wn.2d 170, 195, 481 P.3d 521 (2021). Because the court found the underlying statute unconstitutional, it vacated the defendant's conviction. Id. Caril is entitled to be resentenced under Blake.

Third, the State concedes no reference to Caril's conviction for felony murder in the second degree should have been made in his judgment and sentence under double jeopardy principles. The United States and Washington State constitutions protect persons from being twice put in jeopardy for the same offense. See U.S. CONST. amend. V; WASH. CONST. art. I, § 9. Both clauses protect against "being (1) prosecuted a second time for the same offense after acquittal, (2) prosecuted a second time for the same offense after conviction, and (3)

18

punished multiple times for the same offense." State v. Linton, 156 Wn.2d 777, 783, 132 P.3d 127 (2006); Brown v. Ohio, 432 U.S. 161, 165, 97 S. Ct. 2221, 53 L. Ed. 2d 187 (1977).

In State v. Turner, the Supreme Court held that "a court may violate double jeopardy either by reducing to judgment both the greater and the lesser of two convictions for the same offense or by conditionally vacating the lesser conviction while directing, in some form or another, that the conviction nonetheless remains valid." 169 Wn.2d 448, 464, 238 P.3d 461 (2010) (emphasis omitted). Double jeopardy prohibits courts from explicitly holding vacated lesser convictions for reinstatement should the more serious conviction for the same criminal conduct be overturned on appeal. Id. at 465. The judgment and sentence cannot have any reference to the vacated conviction, and an order appended to the judgment and sentence also cannot contain such a reference. Id. Turner concluded, "In the future, the better practice will be for trial courts to refrain from any reference to the possible reinstatement of a vacated lesser conviction." Id. at 466.

Here, the trial court entered an order vacating Caril's conviction for felony murder for purposes of sentencing to avoid violating double jeopardy, but this was insufficient under Turner. Caril's conviction for felony murder in the second degree and the associated deadly weapon enhancement should not be in the judgment and sentence. Thus, resentencing consistent with Turner is appropriate.

Finally, Caril seeks correction of a scrivener's error in the judgment and sentence. The judgment and sentence originally incorrectly cited RCW

19

No. 82334-5-I/20

9A.32.030(1)(a) as the relevant statute for Caril's conviction for second degree intentional murder. The correct statute is RCW 9A.32.050(1)(a). This error was corrected by the trial court in a subsequent order and is moot.

IV

We affirm Caril's conviction, vacate his sentence, and remand for resentencing.

_Birk, J._

WE CONCUR:

_Coburn, J._       _Dwyer, J._

20