# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In re the Personal Restraint Petition of:<br><br>ANTHONY RYAN PUGH,<br><br>                 Petitioner. | No.  50055-8-II<br><br><br><br>PUBLISHED OPINION |

MELNICK, J. — Anthony Ryan Pugh seeks relief from personal restraint imposed following his 1995 convictions for kidnapping in the first degree, robbery in the first degree, conspiracy to commit kidnapping in the first degree, conspiracy to commit robbery in the first degree, and conspiracy to commit murder in the first degree.  Pugh committed these offenses while he was a juvenile.

Under RCW 9.94A.730(3), the *Miller*[1] fix statute, a juvenile offender who commits a crime, other than aggravated murder in the first degree, may petition the Indeterminate Sentencing Review Board (ISRB) for release after serving 20 years of confinement.  The ISRB is required to release the individual unless it determines, by a preponderance of the evidence, that the individual is more likely than not to commit new criminal law violations if released.  RCW 9.94A.730(3).

In 2015, Pugh requested release under RCW 9.94A.730(3).  The ISRB found Pugh was not likely to commit a crime if released, but delayed his release for 18 months so certain conditions could be met.  In 2017, the ISRB found Pugh did not meet the conditions imposed and found him

---

[1] *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012).

more likely than not to commit criminal law violations if released. Pugh filed this personal restraint petition (PRP), arguing that under RCW 9.94A.730(3), the ISRB was not permitted to impose pre-release conditions in 2015 after finding that Pugh was unlikely to reoffend. Pugh further argues the ISRB abused its discretion by not releasing him in 2015 and by finding him likely to reoffend in 2017.

We conclude that the ISRB lacked authority in 2015 to impose pre-release conditions and delay Pugh's release by 18 months after its finding that Pugh was not likely to reoffend. But because the ISRB made a subsequent finding that Pugh was likely to commit new criminal violations, we deny his PRP.

FACTS

In 1995, a jury convicted Pugh of kidnapping in the first degree, robbery in the first degree, conspiracy to commit kidnapping in the first degree, conspiracy to commit robbery in the first degree, and conspiracy to commit murder in the first degree. The sentencing court imposed 352.25 months. We affirmed Pugh's convictions and sentence in an unpublished opinion. *State v. Pugh*, noted at 87 Wn. App. 1053 (1997).

In 2014, Pugh petitioned the ISRB for early release under RCW 9.94A.730(3). In July 2015, the ISRB entered its written decision. The ISRB stated that it was making a "Deferred Decision," but then found:

> Based on the burden of proof set out in RCW 9.94A.730(3) and the totality of evidence and information provided to the Board, the Board does not find by a preponderance of the evidence that Mr. Pugh is more likely than not to commit any new criminal law violations if released on conditions.

Supp. Br. of Resp't at Ex. 2, at 1. The ISRB then deferred Pugh's release for 18 months conditioned upon "satisfactory completion of a transition through lower levels of custody that preferably includes a period of time in work release." Supp. Br. of Resp't at Ex. 2, at 1. The ISRB

2

set Pugh's release date as February 28, 2017, but stated that his "actual release date is contingent upon the approval of the Offender Release Plan and any mandatory Law Enforcement Notification." Supp. Br. of Resp't at Ex. 2, at 1.

Soon after the ISRB's decision, Pugh missed two college readiness classes. When Pugh did attend class, he was argumentative and angry.

Pugh transferred to Larch Corrections Center (LCC), a minimum security facility. While at LCC, Pugh had several behavior management incidents. He was angry and disrespectful towards his instructors. During one class, Pugh became "angry (red face, veins popping out of his arms and forehead, balled fists, piercing eyes) stating '[t]his is all your fault! You caused this! You are negative and I came to this class wanting to participate. I don't even like you.'" Supp. Br. of Resp't at Ex. 5, at 3.

In another occurrence, Pugh was asked by one of his instructors how his business class was going. Pugh responded, "I will give you 100% Monday and Wednesday in class other than that do not talk to me."

In June 2016, the ISRB received information that Pugh committed two infractions while at LCC: strong-arming/intimidation and discriminatory harassment. Pugh was transferred to a hospital for a mental health evaluation. Pugh's release plan was suspended. The two infractions were later dropped.

In January 2017, the ISRB conducted another release hearing. The ISRB considered Pugh's ISRB file, the most recent Department of Corrections (DOC) plan, information regarding institutional behavior and programing, letters directed to the ISRB at the presentence investigation, and a psychological evaluation completed in April 2015. The ISRB also heard from Pugh, who stated that it was difficult transferring to LCC where he did not know anyone and he

"underestimated the amount of stress and worry that [he] was going to be going though." Report of Proceedings (RP) at 76. The ISRB found that Pugh "is more likely than not to commit a new crime if released" and denied his petition for early release.[2] Supp. Br. of Resp't at Ex. 4, at 6. Pugh filed this PRP.

## ANALYSIS

Pugh contends he was unlawfully restrained in 2015 because the ISRB failed to release him after finding he was not likely to commit a crime if released. We agree.

A.      STANDARD OF REVIEW

A petitioner who challenges a decision from which he has had no previous or alternative avenue for obtaining state judicial review must show he is under restraint unlawfully under the provisions of RAP 16.4(c). *In re Pers. Restraint of Cashaw*, 123 Wn.2d 138, 149, 866 P.2d 8 (1994). Under RAP 16.4, Pugh may show either a constitutional or a state law violation to obtain relief. RAP 16.4(c)(2), (6). Interpretation of a statute is a question of law that we review de novo. *State v. Scott*, 190 Wn.2d 586, 591, 416 P.3d 1182 (2018).

B.      RCW 9.94.730–THE MILLER FIX STATUTE

While Pugh has been incarcerated the law of juvenile sentencing has changed dramatically. In 2012, the United States Supreme Court decided *Miller*, 567 U.S. at 465, which held that a sentence imposed on a juvenile of mandatory life without parole violates the prohibition on cruel and unusual punishment under the Eighth Amendment to the United States Constitution. Following *Miller*, our legislature passed an act to allow inmates who are serving sentences for crimes committed as a juvenile to petition for early release after serving 20 years. SEE LAWS OF 2014, ch. 130, § 10 (codified at RCW 9.94A.730).

---

[2] Pugh's current earned release date is February 2020.

Once an offender petitions for release, the ISRB is then required to conduct "an examination of the person, incorporating methodologies that are recognized by experts in the prediction of dangerousness, and including a prediction of the probability that the person will engage in future criminal behavior if released on conditions to be set by the board." RCW 9.94A.730(3). The ISRB "shall order the person released under such affirmative and other conditions[3] as the board determines appropriate, unless the board determines by a preponderance of the evidence that, despite such conditions, it is more likely than not that the person will commit new criminal law violations if released." RCW 9.94A.730(3). In short, RCW 9.94A.730 "provides a specific right to petition and a presumption of early release, and imposes a standard for the ISRB to apply." *Scott*, 190 Wn.2d at 600-01.

## C.    LEGISLATIVE INTENT

Our first priority in statutory interpretation is to ascertain the legislative intent. *State v. Larson*, 184 Wn.2d 843, 848, 365 P.3d 740 (2015). We first examine the plain language of the statute "as '[t]he surest indication of legislative intent.'" *Larson*, 184 Wn.2d at 848(quoting *State v. Ervin*, 169 Wn.2d 815, 820, 239 P.3d 354 (2010)). To interpret a statute's plain language, we examine the text of the statute, "as well as 'the context of the statute in which that provision is found, related provisions, and the statutory scheme as a whole.'" *Ervin*, 169 Wn.2d at 820 (quoting *State v. Jacobs*, 154 Wn.2d 596, 600, 115 P.3d 281 (2005)). We may not interpret a statute in a way that renders a portion of the statute meaningless or superfluous. *State v. K.L.B.*, 180 Wn.2d 735, 742, 328 P.3d 886 (2014).

---

[3] The term "such affirmative and other conditions" relates to the statute's prior sentence, which requires DOC to conduct an examination of the juvenile offender and assess whether "the person will engage in future criminal behavior if released on conditions to be set by the board." RCW 9.94A.730(3).

Under the plain meaning of RCW 9.94A.730(3), the ISRB is required to release a juvenile offender *unless* it finds he is likely to reoffend. In 2015, Pugh petitioned for release after serving 20 years. Following a hearing, the ISRB "[did] not find" by a preponderance of the evidence that Pugh was likely to commit any new criminal law violation. Supp. Br. of Resp't at Ex. 2, at 1. While the ISRB stated it was a "Deferred Decision," the ISRB still made a finding following the hearing that triggered the requirement of release. Supp. Br. of Resp't at Ex. 2, at 1. Thus, based on the plain language of RCW 9.94A.730(3), the ISRB was required to release Pugh in 2015 after making the finding he was not likely to reoffend. "[W]e construe statutes assuming that the legislature meant exactly what it said." *Umpqua Bank v. Shasta Apartments, LLC*, 194 Wn. App. 685, 694, 378 P.3d 585, *review denied*, 186 Wn.2d 1026 (2016).

D.     PUBLIC SAFETY CONSIDERATIONS AND PREPARING OFFENDERS FOR RELEASE

RCW 9.94A.730(3) states that the ISRB "shall give public safety considerations the highest priority when making all discretionary decisions regarding the ability for release and conditions of release." The ISRB argues that conditioning Pugh's release on a successful "step-down" approach balances the ISRB's responsibility to prepare him for release and to promote public safety. Supp. Br. of Resp't at 14.

In drafting the *Miller* fix statute, our legislature contemplated an offender's need to prepare for release. Under RCW 9.94A.730(2), the DOC "shall conduct an assessment of the offender and identify programming and services that would be appropriate to prepare the offender for return to the community. To the extent possible, the [DOC] shall make programming available as identified by the assessment." This is to occur "[n]o later than five years prior to the date the offender will be eligible to petition for release." RCW 9.94A.730(2). In Pugh's case, there was no time for the assessment between the time period when the *Miller* fix statute went into effect and Pugh's petition

6

for release. But the ISRB could have determined Pugh was not ready for release and ordered further programming and services to prepare him for release. *See In re Pers. Restraint Petition of McCarthy*, 134 Wn. App. 752, 758-59, 143 P.3d 599 (2006), *rev'd on other grounds by In re Pers. Restraint of McCarthy*, 161 Wn.2d 234, 164 P.3d 1283 (2007) (under RCW 9.95.420–the sex offender release statute–the ISRB has authority to determine that an inmate is not ready for release and can order further treatment to help rehabilitate the offender prior to release).

Problematic here is the ISRB's imposition of pre-release conditions after finding that Pugh was not likely to reoffend. This action is contrary to the plain language of RCW 9.94A.730(3). "'An agency may not legislate under the guise of rulemaking power. Rules must be written within the framework and policy of the applicable statutes.'" Jeremiah Bourgeois, *A Janus-Faced Approach: Correctional Resistance to Washington State's Miller Fix*, 15 Ohio St. J. Crim. L. 451, 468 (2018) (quoting *Kitsap-Mason Dairyman's Ass'n v. Wash. State Tax Comm'n*, 77 Wn.2d 812, 815, 467 P.2d 312 (1970)); s*ee also Wash. State Hosp. Ass'n v. Dep't of Health*, 183 Wn.2d 590, 595, 353 P.3d 1285 (2015) ("Rules that are not consistent with the statutes that they implement are invalid."). "Unless the [ISRB] determines that a prisoner's release would more likely than not result in further law breaking he is, in the eyes of the legislature at least, ready to rejoin society." *A Janus-Faced Approach: Correctional Resistance to Washington State's Miller Fix*, 15 Ohio St. J. Crim. L. at 468. While public safety and the preparation of offenders for release are important duties of the ISRB, the board may not promulgate rules to effectuate these duties that are contrary to the mandates of our legislature.

We conclude that the plain language of RCW 9.94A.730(3) did not grant the ISRB the authority to impose pre-release conditions and delay Pugh's release by 18 months after finding by

7

a preponderance of the evidence that he was not likely to commit new criminal law violations. Accordingly, Pugh shows a state law violation to warrant relief under RAP 16.4(c)(6).[4]

We would generally grant the PRP and remand for release. But this case presents the unique fact that the ISRB made a subsequent finding that Pugh was likely to commit new criminal law violations if released. We next address whether the ISRB abused its discretion in making this finding and the effect of this finding on the disposition of this matter.

E.      2017 FINDING THAT PUGH IS LIKELY TO COMMIT NEW CRIMINAL LAW VIOLATIONS

Pugh contends that the ISRB abused its discretion in 2017 by finding that he was likely to commit new criminal law violations. We disagree.

The burden rests with the petitioner to prove the ISRB abused its discretion. *In re Pers. Restraint of Addleman*, 151 Wn.2d 769, 776, 92 P.3d 221 (2004). The ISRB abuses its discretion when it acts without consideration of and in disregard of the facts. *In re Pers. Restraint of Dyer*, 157 Wn.2d 358, 363, 139 P.3d 320 (2006). "Reliance upon 'speculation and conjecture' with disregard of the evidence also constitutes an abuse of discretion." *In re Pers. Restraint of Dyer*, 164 Wn.2d 274, 285, 189 P.3d 759 (2008).

As discussed above, the ISRB is required to release an offender under RCW 9.94A.730(3), "unless the board determines by a preponderance of the evidence that, despite such conditions, it is more likely than not that the person will commit new criminal law violations if released." "Preponderance of the evidence means evidence that is more probably true than not true." *In re Welfare of Sego*, 82 Wn.2d 736, 739 n. 2, 513 P.2d 831 (1973).

---

[4] Accordingly, we need not reach Pugh's additional argument that the ISRB abused its discretion in failing to release him in 2015. *See Schmidt v. Cornerstone Invs., Inc.*, 115 Wn.2d 148, 165, 795 P.2d 1143 (1990) (a reviewing court is not obliged to decide all the issues raised by the parties, but only those which are determinative).

Here, Pugh missed two college readiness classes soon after the ISRB's 2015 decision. When Pugh did attend class, he was argumentative and angry. The ISRB then transferred Pugh to a minimum security facility. While at the facility, Pugh had several behavior management incidents. He was angry and disrespectful towards his instructors. During one class, Pugh became "angry (red face, veins popping out of his arms and forehead, balled fists, piercing eyes) stating '[t]his is all your fault! You caused this! You are negative and I came to this class wanting to participate. I don't even like you.'" Supp. Br. of Resp't at Ex. 5, at 3. In another occurrence, Pugh was asked by one of his instructors how his business class was going. Pugh responded, "I will give you 100% Monday and Wednesday in class other than that do not talk to me." Supp. Br. of Resp't at Ex. 5, at 2.

In July 2016, the ISRB received information that Pugh committed two infractions while at the minimum security facility for strong-arming/intimidation and discriminatory harassment. Pugh was transferred to a hospital for a mental health evaluation. The two infractions were later dropped.

In January 2017, the ISRB conducted a second release hearing. The ISRB considered Pugh's ISRB file, the most recent DOC plan, information regarding institutional behavior and programing, letters directed to the ISRB at the presentence investigation, and a psychological evaluation completed in April 2015. The ISRB also heard from Pugh, who stated that it was difficult transferring to the minimum security facility where he did not know anyone and he "underestimated the amount of stress and worry that [he] was going to be going through." RP at 76.

Based on the above, a preponderance of evidence supports the ISRB's 2017 finding that Pugh "is more likely than not to commit a new crime if released." Supp. Br. of Resp't at Ex. 4, at 6. Accordingly, there was no abuse of discretion.

## CONCLUSION

We conclude that the plain language of RCW 9.94A.730 did not grant the ISRB the authority to impose pre-release conditions and delay Pugh's release by 18 months after finding by a preponderance of the evidence that he was not likely to commit new criminal law violations. However, given that this case presents the unique fact that the ISRB made a subsequent finding that Pugh was likely to reoffend if released, and given that under RCW 9.94A.730(3), public safety considerations must be given "the highest priority," we conclude that remanding for release is not the proper remedy. We, therefore, deny Pugh's PRP.

Melnick, J.

I concur:

Maxa, C.J.

10

LEE, J. (dissenting) – The majority agrees that the Indeterminate Sentencing Review Board (ISRB) violated "the plain language of RCW 9.94A.730(3)" in 2015 when it imposed pre-release conditions *after* finding Pugh was not likely to reoffend.[5] Majority at 8.. But because the ISRB was allowed to make a subsequent determination in 2017 (after violating the law in 2015) that Pugh is likely to reoffend, the majority denies Pugh's personal restraint petition (PRP). Majority Opinion at 10. I respectfully disagree with the majority's position of further punishing Pugh by denying Pugh's PRP based on the ISRB's 2017 decision *after* the ISRB clearly violated RCW 9.94A.730(3) in 2015.

In his PRP, Pugh "contends he is unlawfully restrained in 2015 because the ISRB failed to release him after finding he was not likely to commit a crime if released." Majority at 4. The majority, as do I, agree with Pugh that the ISRB erred in 2015. However, the majority concludes Pugh is not unlawfully restrained because of the ISRB's subsequent finding in 2017. That is where the majority and I depart.

Contrary to the majority's position, Pugh remains unlawfully restrained because the ISRB had no statutory authority to set pre-release conditions on Pugh after finding he was not likely to commit a crime if released in 2015. If the ISRB had not violated RCW 9.94A.730(3) in 2015 and had released Pugh as required by the statute, the ISRB would not have had the opportunity to make its 2017 determination. Therefore, I respectfully disagree with the majority's reliance on the ISRB's 2017 decision. I would grant Pugh's PRP and remand for his release.

_____
Lee, J.

---

[5] On October 26, 2016, Pugh filed a PRP in this court challenging the ISRB's 2015 decision to set pre-release conditions despite finding that Pugh was not likely to reoffend. However, we did not waive the filing fee, and Pugh was required to pay a filing fee. Pugh did not pay the filing fee, and his challenge was not reviewed.