IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| In the Matter of the Personal Restraint Petition of | ) ) ) | No. 79887-1-I |
| JEREMIAH BOURGEOIS, | ) ) | UNPUBLISHED OPINION |
| Petitioner. | ) ) | |

BOWMAN, J. — In this personal restraint petition (PRP), Jeremiah

Bourgeois challenges several community custody conditions imposed by the

Indeterminate Sentence Review Board (ISRB) upon his release from prison. We

strike the condition imposing geographical restrictions but dismiss Bourgeois'

remaining challenges.

FACTS

In 1993, a jury convicted Bourgeois of aggravated first degree murder and

first degree assault.[1] He was 14 years old at the time of the crimes. The court

sentenced Bourgeois to a mandatory minimum sentence of life in prison without

parole.

In 2012, the United States Supreme Court issued Miller v. Alabama, 567

U.S. 460, 465, 132 S. Ct. 2455, 183 L. Ed. 2d 407, holding mandatory life

sentences without parole for juveniles unconstitutional. In response, the

_____

[1] Bourgeois' older brother shot two Seattle store owners. The victims testified against the brother, who was convicted of first degree assault. After his brother's sentencing, Bourgeois returned to the store and shot the victims in retaliation for their testimony against his brother, killing one of them.

Citations and pin cites are based on the Westlaw online version of the cited material.

Washington Legislature enacted the "Miller fix." In re Pers. Restraint of McNeil, 181 Wn.2d 582, 588, 334 P.3d 548 (2014). The Miller fix requires courts to " 'take into account mitigating factors that account for the diminished culpability of youth' " when sentencing juvenile offenders convicted of aggravated first degree murder. McNeil, 181 Wn.2d at 588-89 (quoting RCW 10.95.030(3)(b)).

The Miller fix entitled Bourgeois to resentencing under the new guidelines. See McNeil, 181 Wn.2d at 589. His resentencing led to an indeterminate sentence of a minimum term of 25 years in prison and a maximum term of life in prison. See RCW 10.95.030(3)(a)(i). The sentence allowed Bourgeois to petition the ISRB for early release after serving at least 20 years of confinement. RCW 9.94A.730(1); see RCW 10.95.030(3)(d)-(i).

At first, Bourgeois "adjusted poorly to imprisonment" and spent much time in solitary confinement. During that time, he was convicted of two custodial assaults. But as he got older, "he gained behavioral control and pursued intellectual growth." Bourgeois graduated from college, earned a paralegal certificate, and wrote law review and other articles for national publication.

In 2017, Bourgeois petitioned the ISRB for early release. The ISRB denied the petition, finding "by a preponderance of the evidence that Mr. Bourgeois is more likely than not to commit . . . new criminal law violations if released on conditions." It based its decision on (1) a psychological evaluation assessing Bourgeois as " 'Moderate to High' " risk to reoffend, (2) Bourgeois' two felony assaults against corrections officers early in his prison stay, and (3) his "particularly heinous" original offense. While the ISRB commended Bourgeois'

completion of "a significant amount of programming," it concluded he was "not releasable" and added 30 months to his minimum term.  Bourgeois filed this PRP and three amendments contesting several aspects of the ISRB's 2017 decision.

Bourgeois again petitioned the ISRB for release in August 2019.  An updated psychological evaluation rated his overall risk to reoffend as moderate.  The ISRB found Bourgeois releasable, reduced his minimum sentence by 7 months, and issued a release order.  But the Department of Corrections (DOC) did not release Bourgeois because he was still obligated to serve a determinate 10-month consecutive sentence imposed by Clallam County Superior Court for one of his custodial assault convictions.  The ISRB recommended Bourgeois "start preparing for a successful reentry into the community" while serving that sentence.  "He should access any re-ent[ry] programs" and "should continue to remain Serious Infraction free and maintain his positive influence on others."  Soon after the ISRB's decision, Bourgeois filed a fourth amendment to his PRP, alleging the ISRB improperly placed preconditions on his release.

On April 9, 2019, the ISRB released Bourgeois from his aggravated first degree murder sentence and he began serving his determinate sentence for custodial assault.  DOC released Bourgeois from that sentence on October 28, 2019.  Upon his release, Bourgeois began serving his three-year term of community custody imposed by the ISRB.  Bourgeois filed more amendments to his PRP, challenging several conditions of his community custody.

ANALYSIS

To succeed on a PRP challenge of an ISRB decision, a petitioner must show he is under unlawful restraint. In re Pers. Restraint of Dyer, 164 Wn.2d 274, 285, 189 P.3d 759 (2008). A petitioner is under restraint when

> the petitioner has limited freedom because of a court decision in a civil or criminal proceeding, the petitioner is confined, the petitioner is subject to imminent confinement, or the petitioner is under some other disability resulting from a judgment or sentence in a criminal case.

RAP 16.4(b). A petitioner must show more than speculation, conjecture, or conclusory allegations. In re Pers. Restraint of Gronquist, 138 Wn.2d 388, 396, 978 P.2d 1083 (1999).

Bourgeois raises several allegations of unlawful restraint pertaining to the terms of his release from confinement and the community custody conditions the ISRB imposed.[2]

Consecutive Sentence

A court twice convicted Bourgeois of custodial assault while in prison. Bourgeois was 20 years old at the time of his second conviction. The trial court issued a 10-month determinate sentence consecutive to his aggravated murder sentence. When the ISRB released Bourgeois from his indeterminate sentence, he began serving the 10-month sentence for custodial assault.

---

[2] Bourgeois raises many issues related to the ISRB's 2017 and 2019 decisions. He challenges how the ISRB determined his eligibility for release and the lawfulness of conditions imposed before his release. Those issues are now moot as he is no longer confined. Even so, Bourgeois asks that we consider his claims because they are "matters of continuing and substantial public interest" requiring an exception to mootness. See In re Pers. Restraint Petition of Mines, 146 Wn.2d 279, 285, 45 P.3d 535 (2002) (court may decide a technically moot petition that involves matters of continuing and substantial public interest). We decline to address the issues for which Bourgeois is not currently under restraint.

Bourgeois contends the ISRB "should have released [him] from [both] sentences he was serving" and "should credit him for the additional time he spent in prison [serving the consecutive determinate sentence] by reducing the community custody term he is presently serving." The State disagrees, arguing the ISRB had no discretion to modify a determinate sentence imposed for an unrelated crime several years after Bourgeois was sentenced for the aggravated murder. We agree with the State.

We review a determination of the ISRB for abuse of discretion. In re Pers. Restraint Petition of Pugh, 7 Wn. App. 2d 412, 421, 433 P.3d 872 (2019). A failure to exercise discretion is an abuse of discretion. State v. O'Dell, 183 Wn.2d 680, 697, 358 P.3d 359 (2015).

Under RCW 9.94A.589(2)(a), whenever a person under sentence for conviction of a felony commits another felony and is sentenced to another term of confinement, the latter term of confinement shall not begin until expiration of all prior terms of confinement. Citing State v Gilbert, 193 Wn.2d 169, 175-76, 438 P.3d 133 (2019), Bourgeois argues the Miller fix authorizes the ISRB to depart from this statute because it "gives full discretion over the total sentence the person is serving and does not require previously imposed consecutive sentences to remain consecutive."

In Gilbert, a jury convicted a juvenile defendant of aggravated murder, first degree murder, and several other crimes based on a single incident. Gilbert, 193 Wn.2d at 171-72. The court sentenced the defendant to life without parole for the aggravated murder and imposed a consecutive sentence for the first degree

murder. Gilbert, 193 Wn.2d at 172. The Miller fix entitled the defendant to resentencing. But the trial court concluded it had authority only to resentence for the aggravated murder, leaving the consecutive sentence for the first degree murder intact. Gilbert, 193 Wn.2d at 172. Our Supreme Court disagreed:

> [E]ven if the resentencing court here was correct in its conclusion that RCW 10.95.035, on its face, limits the scope of a resentencing hearing to merely adjusting aggravated murder sentences—it was, nevertheless, required to consider Gilbert's youth as a mitigating factor and had discretion to impose a downward sentence [on his other convictions as well]. RCW 10.95.035 cannot act to limit that discretion.

Gilbert, 193 Wn.2d at 176.

> According to Bourgeois, Gilbert applies to his case because the Miller fix
>
> directs the ISRB to make a release decision based on the personal circumstances of the person as considered in their totality. It does not require the ISRB to treat consecutive sentences as imposed separately and apart from other terms.

But unlike the trial court in Gilbert, the ISRB did not have jurisdiction over both of Bourgeois' sentences. The ISRB attained jurisdiction to consider only Bourgeois' petition for early release from his aggravated murder sentence. See RCW 10.95.030(3)(e). Bourgeois points to no statutory authority empowering the ISRB to disturb an unrelated consecutive determinate sentence. And while Gilbert makes clear that RCW 9.94A.589(2)(a) does not preclude a trial court from issuing concurrent sentences when justified by an offender's youth, it does not go so far as to authorize a judicial officer or the ISRB to modify a sentence over which it has no jurisdiction. The ISRB did not abuse its discretion by refusing to modify Bourgeois' consecutive determinate sentence.

Community Custody Conditions

Bourgeois argues he is under unlawful restraint because of "onerous, unconstitutional, and unauthorized conditions" of community custody. We review community custody conditions imposed by the ISRB for abuse of discretion. In re Pers. Restraint of Winton, 196 Wn.2d 270, 277-78, 474 P.3d 532 (2020).

Community custody is an extension of incarceration, so an individual's constitutional rights are subject to the infringements authorized by chapter 9.94A RCW. Winton, 196 Wn.2d at 275. Under RCW 9.94A.704(10)(c), the ISRB may impose community custody conditions that are reasonably related to the crime of conviction, the offender's risk of reoffending, or safety of the community. The relevant inquiry is whether the condition is "crime-related," which means reasonably related to the crime, the risk of re-offense, and public safety. Winton, 196 Wn.2d at 278. If a community custody condition fails to meet any of these requirements, "it is manifestly unreasonable and should be removed." Winton, 196 Wn.2d at 278.[3]

### 1. First Amendment Rights

Bourgeois argues that "DOC imposed and enforced conditions that unreasonably violate [his] right to free speech and freedom of the press." U.S. CONST. amend. I. According to Bourgeois, his community corrections officer (CCO) (A) ordered him "to cease his present or future efforts to aid people in

---

[3] Bourgeois argues that a community custody condition affecting a constitutional right must be " 'reasonably necessary to accomplish the essential needs of the state' " and "narrowly imposed." (Quoting State v. Riles, 135 Wn.2d 326, 350, 957 P.2d 655 (1998), abrogated on other grounds by State v. Valencia, 169 Wn.2d 782, 239 P.3d 1059 (2010).) As much as Bourgeois is suggesting we must apply strict scrutiny when reviewing such conditions, we disagree. See Winton, 196 Wn.2d at 275.

prison by sending written materials to a prosecutor or attorney about their cases," (B) would not allow him to participate in a conference for lawyers "without advance approval of 'what exactly he would be doing [and] saying' " at the conference, and (C) "accused him of engaging in unapproved 'employment' " after he spoke at a press conference. The record does not support Bourgeois' allegations.

### A. Advocacy of Cellmate's Release Plan

Shortly after his release from prison, Bourgeois e-mailed both a deputy prosecuting attorney and the attorney of his former cellmate's victim advocating for a change to the cellmate's release plan. The victim contacted DOC, expressing "fear and confusion" about Bourgeois' e-mail.

The ISRB was concerned Bourgeois' e-mail "could be considered as threatening, given that he had been convicted of murdering the witness to a crime and that his e[-]mail noted that he knew the whereabouts of his former cellmate's victim." As a result, Bourgeois' CCO explained to him that while he violated no conditions of his community custody, the "optics" of his e-mail were "concerning." The CCO cautioned Bourgeois that

> it was not a good idea to get involved in cases like this one . . .
> where he advocates for personal friends from prison by contacting
> their victim's attorneys, unconnected to his professional goals of
> being an advocate for young victims of discrimination, as this raises
> offense cycle behavior concerns.[4]

The CCO's warning to Bourgeois was not a directive to stop advocating on behalf of individual prisoners. It was a communication urging Bourgeois to

---

[4] The CCO also expressed concern that Bourgeois' attempt to contact the victim on behalf of his former cellmate could be viewed as the cellmate's attempt to circumvent a no-contact order prohibiting third-party contact between the two.

consider how his contact with a former cellmate's victim through her attorney may be perceived. The communication did not impact Bourgeois' free speech and did not amount to an abuse of discretion.

### B. Travel Pass

In another exchange with his CCO, Bourgeois requested a travel pass to eastern Washington to speak at a conference for lawyers with a retired judge who was his former defense attorney. The CCO reviewed a brochure about the conference, asked Bourgeois about his role in the conference, and said he "would need more information about this conference, who had invited him and what exactly he would be doing/saying at this conference." One of the conference organizers called the CCO and explained that Bourgeois would not "be acting in any type of legal authority or giving legal advice at the conference." Rather, Bourgeois would be speaking about his experience as a teenager in the legal and prison systems, and he and the judge would "dialogue with each other regarding topics such as the challenges of communication with a juvenile client, and how issues of race and class impact the attorney-client relationship." The CCO granted the travel pass.

The record does not support Bourgeois' suggestion that the CCO conditioned Bourgeois' travel pass on the content of his speech. Instead, the CCO appropriately requested general information about the conference and Bourgeois' role as presenter to assess whether to approve the pass.

C. Press Conference

Finally, Bourgeois asserts that his CCO threatened him in response to his appearance at a televised press conference organized by Columbia Legal Services. At the conference, Bourgeois "advocated for releasing all those who no longer posed a risk to society, regardless of their crimes, as this was also necessary to deal with the public health concerns posed by COVID-19."[5] According to Bourgeois, after his appearance at the press conference, the CCO "accused him of engaging in unapproved 'employment' even though he was not paid for his remarks."

As much as Bourgeois is arguing that the ISRB may not retaliate against him for exercising his free speech rights, he is correct. In re Pers. Restraint of Addleman, 151 Wn.2d 769, 775, 92 P.3d 221 (2004). But to show retaliation, Bourgeois must establish that the ISRB's action was in fact retaliatory and that the alleged retaliatory action advanced no legitimate supervisory goals. Addleman, 151 Wn.2d at 776.

Here, Bourgeois' CCO saw the press conference and called Bourgeois "to inquire about his relationship to Columbia Legal Services" because his conditions of release require preapproval of all employment. Bourgeois told his CCO that "someone associated with Columbia Legal Services asked him to be on the panel." The CCO told Bourgeois he would "ask the ISRB for guidance on his involvement in public events, public speaking, and offering opinions on legal matters." About a week later, Bourgeois' CCO told him that the televised press

---

[5] COVID-19 is the World Health Organization's official name for "coronavirus disease 2019," first discovered in December 2019 in Wuhan, China. COVID-19 is a severe respiratory illness which is highly contagious and quickly spread throughout the world.

conference did not violate any condition. The CCO explained that "no one was restricting his right to advocate on behalf of prisoners, to voice his opinions, to publish on prisoner rights, and to travel to make his voice on behalf of others heard" so long as it was "not done in a way that appears to threaten crime victims with violence." Bourgeois fails to show that his CCO acted in retaliation to his exercise of free speech.

### 2. Geographical Restriction

As a condition of his community custody, Bourgeois "must not enter the City of Seattle, Washington, South of [Interstate]-520/Elliot Bay/Salmon Bay/Lake Union, without prior written approval of [his] CCO and the ISRB."[6] Bourgeois argues this violates his right to travel "by placing unnecessary geographical restrictions barring him from Seattle, and limiting any time spent in King County." The State contends this condition is necessary to address the "community concerns" raised by the ISRB's victim liaison.

"While the right to travel is recognized as a fundamental right of citizenship, this right is affected by a criminal conviction." Winton, 196 Wn.2d at 274. Infringement on an offender's right to travel is authorized while serving community custody. Winton, 196 Wn.2d at 275. "Because an individual who is transferred from total confinement to community custody remains under the continuing jurisdiction of the ISRB, the right to travel is not entirely restored." Winton, 196 Wn.2d at 275. The ISRB may impose geographical restrictions as

---

[6] Bourgeois claims that while the ISRB decided to prohibit him from entering "downtown Seattle southward," his CCO "expanded that prohibition and ordered him not to take part in any activities outside of Snohomish County without express permission." The record does not support his claim.

"crime-related prohibitions" if they directly relate to the circumstances of the crime of conviction. Winton, 196 Wn.2d at 276. Such conditions must "bear a reasonable relation to the circumstances of the crime, the offender's risk of reoffense, and public safety." Winton, 196 Wn.2d at 276; RCW 9.94A.704(10)(c)(i)-(iii).

In Winton, our Supreme Court determined that a restriction from entering Clark County was sufficiently crime-related where "Winton's victims reside, work, and attend school within Clark County." Winton, 196 Wn.2d at 279. And the restriction "reasonably reduce[d] the risk of reoffense, ensure[d] public safety, and notably, protect[ed] the victims and their families by preventing contact with them." Winton, 196 Wn.2d at 279. Here, the ISRB restricted Bourgeois from entering a large area of Seattle because of "active community concerns for survivors." But the ISRB fails to explain the basis for the community concerns. Because we cannot conclude from such a broad statement that the ISRB's geographical restriction bears a reasonable relationship to the circumstances of Bourgeois' crime, his risk of re-offense, or public safety, we grant Bourgeois' PRP on this issue and strike the condition.

### 3. Routine Polygraphs

The ISRB imposed as a condition of community custody that Bourgeois "submit to a polygraph examination . . . at the discretion of [his] CCO to verify compliance with [his] release conditions." It also declared that the results of any polygraph are admissible in any violation hearing before the ISRB. Bourgeois contends this condition violates DOC's own policy governing the use of

12

polygraph tests and allows for misuse of unreliable polygraph results. We disagree.

Polygraphs are permitted as a condition of community custody to monitor compliance with sentencing conditions. Riles, 135 Wn.2d at 342-43; State v. Combs, 102 Wn. App. 949, 952, 10 P.3d 1101 (2000). Polygraph testing should be used only to monitor compliance with community custody conditions and "not as a fishing expedition to discover evidence of other crimes, past or present." Combs, 102 Wn. App. at 952-53.

Current DOC policy 400.360, directive IV(A), states that "[m]aintenance/monitoring polygraph testing will be conducted periodically to monitor compliance with treatment and/or identified restrictions."[7] Directive IV(C)(1) of the policy allows for at least one monitoring test every six months as ordered by the court or ISRB. Directive IV(E) allows "criminal issue" or "event specific" testing "upon reasonable suspicion" of a violation of supervision. Additionally, subsection II of policy 400.360 states that testing "will supplement, not substitute, other forms of investigation. No adverse action will be taken solely on the basis of a polygraph test that indicates deception."

Bourgeois' community custody condition lands squarely within the confines of DOC policy. Indeed, while DOC policy calls for routine polygraphs every six months, Bourgeois' community custody condition allows for testing only "to verify compliance with [his] release conditions." According to Bourgeois'

---

[7] According to the State, Bourgeois cites an old version of DOC policy 400.360 that allowed polygraphs of a person on community custody who committed a "non-sex offense[ ]" only when there is "reasonable suspicion" that the person has violated conditions of supervision. Only sex offenders are subject to routine polygraphs.

CCO, Bourgeois has not met the criteria for a polygraph and no examination is imminent. While it is true that Bourgeois' condition of community custody deems his test results admissible at ISRB violation hearings, this would only deviate from DOC policy if the results were the sole basis for adverse action. The ISRB did not abuse its discretion in ordering Bourgeois to submit to polygraph testing to verify compliance with his community custody conditions.

We grant Bourgeois' PRP as to the ISRB's geographical restrictions and strike that condition of community custody. We dismiss his PRP as to his remaining challenges.

WE CONCUR: