**FILED**
**MAY 16, 2024**
**In the Office of the Clerk of Court**
**WA State Court of Appeals, Division III**



IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Dependency of | ) | No. 39817-0-III |
| | ) | (consolidated with |
| | ) | No. 39818-8-III) |
| | ) | |
| L.S.† | ) | UNPUBLISHED OPINION |
| | ) | |

LAWRENCE-BERREY, C.J. — In 2023, an Adams County trial court entered a

dependency order and out-of-home placement for L.S., a five-year-old autistic child.

Prior to the order, the State had removed L.S. from his parents' home over concerns of

neglect, domestic violence between the parents, drug use, and other deficiencies. L.S.

had repeatedly arrived at school wearing badly soiled clothes. L.S.'s mother, with L.S. in

her care, had twice been kicked out of a shelter for drug use. The State's concerns

regarding violence in L.S.'s home were confirmed when L.S.'s father, on the day of

removal, initiated a seven-hour standoff with law enforcement during which he verbally

threatened officers. On other occasions, L.S.'s father had thwarted the State's attempts to

conduct home walk-throughs and administer drug tests.

The parents appealed the trial court's dependency and dispositional orders, and

this court consolidated those appeals. Because substantial evidence supports findings

---

† To protect the privacy interests of the minor child, we use their initials
throughout this opinion. Gen. Order for Court of Appeals, *In re Changes to Case Title*
(Wash. Ct. App. Aug. 22, 2018) (effective September 1, 2018), http://www.courts.
wa.gov/appellate_trial_courts.

sufficient to sustain the trial court's orders, we generally affirm. We remand for the trial court to consider placement with a relative.

FACTS

In 2023, the Washington Department of Children, Youth, and Families (the Department) filed a dependency petition for L.S., a high-needs, autistic five-year-old living in Ritzville. L.S. had come to the Department's attention when B.S.—L.S.'s father—had removed L.S. from school and left him at the Vanessa Behan Crisis Nursery in Spokane. As B.S. eventually explained to the Department, he had brought the child to Vanessa Behan because he believed V.M., L.S.'s mother, was cheating on B.S. and associating with gang members who had harmed their child.

When Vanessa Behan informed the Department of L.S.'s situation, social worker Kimberly Stacy contacted V.M. in Ritzville, where she was living at a motel after B.S. had locked her out of the family home. At their first meeting, V.M. disclosed to Ms. Stacy that B.S. physically abused her and that lately the abuse had gotten worse. V.M. showed Ms. Stacy where B.S. had (1) knocked teeth out of her mouth, and (2) hit her ribs with a baseball bat, resulting in visible swelling. On this or another occasion, V.M. further reported that B.S. abused her in front of L.S., who would cover his ears and cry while the abuse occurred.

Pursuant to these reports, Ms. Stacy eventually provided V.M. with instructions for how to enlist the help of a domestic violence advocate. V.M. failed to contact the advocate, however, because—according to Ms. Stacy—V.M. was "confused with multiple phone calls of one step at a time of what to do." Clerk's Papers (CP) at 218. V.M.'s failure to contact the advocate corroborated V.M.'s disclosure to Ms. Stacy that she—V.M.—suffered from cognitive limitations. V.M. admitted that these limitations prevented her from managing L.S.'s appointments and coordinating with L.S.'s school. As a result, B.S. had assumed exclusive responsibility for those tasks. V.M.'s own assessment of her limitations comported with the eventual testimony of social worker Patricia Rodriguez, who stated that V.M. "does have a hard time understanding—simple, like, commands and—the cognitive—there's some cognitive delays." Rep. of Proc. (RP) at 42.

With Ms. Stacy's assistance, V.M. retrieved L.S. from Vanessa Behan and moved with him into a different Spokane shelter. Within 24 hours, that shelter evicted V.M. and L.S. because V.M. had smoked cannabis in the shelter's bathroom. Ms. Stacy intervened, securing a second opportunity for V.M. at the shelter. That opportunity lasted "a couple days" before the shelter again evicted V.M. and L.S. owing to V.M. smoking cannabis in their room. CP at 216. V.M. moved into a hotel with L.S. Around this time, a swab test administered to V.M. indicated methamphetamine use.

3

While still living in Spokane, V.M. sought a protection order against B.S. in Adams County. B.S. attended the protection order hearing, and the record does not indicate that the trial court imposed any order. Although Ms. Stacy had expressed to V.M. the Department's concern about her reuniting with B.S., V.M. and L.S. resumed their life with B.S. in Ritzville after the protection order hearing.

Beyond (1) V.M.'s drug use and cognitive limitations, and (2) B.S.'s violent and erratic disposition, the Department also grew concerned over reports from L.S.'s school about the state of the child's hygiene. According to Camille Nelson, L.S.'s special education teacher, L.S. had begun arriving at school in soiled clothing and dirty diapers from the previous night. Once, L.S. showed up to school for days on end wearing the same vomit-stained sweatpants. Ms. Nelson informed L.S.'s parents of these hygiene issues, but the parents failed to address them. Ms. Nelson testified that she saw no improvement in L.S.'s hygiene during the time she worked with him.

Still another concern for the Department was B.S.'s refusal to allow the Department to (1) conduct walk-throughs of his and V.M.'s home, or (2) administer urinalysis or additional swab tests to V.M. According to Ms. Stacy, B.S. would only consent to these measures if they occurred at a date and time of his choosing. Ms. Stacy explained to B.S. that walk-throughs and drug tests only were meaningful when administered randomly. Nevertheless, B.S. did not alter his position on the matter. Ms.

4

Stacy reported that B.S. in multiple conversations with her had yelled and made her feel unsafe. Several other individuals lodged similar complaints about B.S. As one example, multiple staff members at a hospital accused B.S. of threatening to kill them if they did not promptly refill his prescription. The Department eventually offered B.S. anger management classes.

In February 2023, the Department filed its dependency petition and coordinated with law enforcement to remove L.S. from B.S.'s and V.M.'s home. When law enforcement attempted to take L.S. into custody, however, B.S. initiated a standoff that lasted seven hours. Although B.S. did not engage in physical violence, he threatened such violence when he asked an officer whether that officer was "'willing to fight to [his] last breath'" to execute the removal order. RP at 28. Eventually, B.S. surrendered L.S. to the officers.

Ahead of the dependency hearing, the Department placed L.S. at a foster home in Pasco that was qualified to meet the child's elevated needs. Although the Department coordinated regular parental visits, and facilitated those visits by offering transportation, B.S. and V.M. consistently failed to attend the visits.

As of the dependency hearing, the Department had offered or provided to B.S. and V.M. the following services: urinalysis testing, oral swabbing, family preservation services, domestic violence services, anger management classes, and emergency housing.

According to Ms. Rodriguez, the Department also had offered V.M. a neuropsychological evaluation and B.S. a mental health evaluation. Coordinated special education services also were available through L.S.'s school.

The trial court entered (1) a dependency order and (2) a dispositional order authorizing L.S.'s continued placement in foster care. Although the Department ahead of the dependency hearing had informed the trial court that L.S.'s maternal grandmother was interested in caring for L.S., the court failed to complete the section of its boilerplate order related to relative placement. Moreover, the trial court at the fact-finding hearing did not address the possibility of relative placement.

Finally, the trial court when announcing its ruling noted that "during this trial there were three, sometimes four, deputy sheriff's [sic] present because of the perceived dangerousness of [B.S.]." RP at 71.

B.S. and V.M. timely appeal. Our court has consolidated the parents' appeals.

ANALYSIS

SUBSTANTIAL EVIDENCE AND RESULTING ORDERS

B.S. argues the trial court erred where its findings supporting dependency and out-of-home placement did not derive from substantial evidence. We agree that finding of fact D (finding 2) was in error. However, substantial evidence supports the remaining findings such that we affirm the trial court's orders.

6

*Standard of review*

Our court will affirm a dependency order where the findings supporting that order derive from substantial evidence, and where the trial court applies sound law to those findings. *In re Dependency of M.P.*, 76 Wn. App. 87, 90, 882 P.2d 1180 (1994). Substantial evidence is that quantum of evidence necessary to persuade a fair-minded person of the truth of the premise. *In re Dependency of J.D.P.*, 17 Wn. App. 2d 744, 755, 487 P.3d 960 (2021).

*Finding of fact D (finding 2)*

The trial court found, under finding of fact D (finding 2), that "clear, cogent, and convincing evidence" indicates a "manifest danger . . . that [L.S.] will suffer serious abuse or neglect" if not removed from B.S.'s and V.M.'s home. CP at 147. Evidence is clear, cogent, and convincing where it renders the truth of the premise "'highly probable.'" *In re Welfare of Sego*, 82 Wn.2d 736, 739, 513 P.2d 831 (1973) (quoting *Supove v. Densmoor*, 225 Or. 365, 372, 358 P.2d 510 (1961)).

Here, considerable evidence supports the notion that B.S. exhibited violent tendencies. When law enforcement attempted to remove L.S. from the family home, B.S. began a seven-hour standoff and, with L.S. present, asked one officer if he was willing to die to remove L.S. Social worker Kimberly Stacy stated that B.S. exhibited verbal aggression toward her. Other parties—including hospital staff—made similar

7

allegations.  Additionally, V.M. accused B.S. of domestic violence and complained that

B.S. had knocked some of her teeth out.

Although there is no evidence that B.S. acted violently toward L.S., this is not

necessary to sustain the trial court's finding.  A child hearing or seeing a parent acting in

an abusive manner *is* a victim of abuse.  *Rodriguez v. Zavala*, 188 Wn.2d 586, 595-98,

398 P.3d 1071 (2017) (a child who hears or sees domestic violence *is* a victim of

domestic violence).  The degree of psychological abuse that L.S. would suffer and the

probability it would continue are substantial, given B.S.'s tendency to escalate conflicts.

As to neglect, evidence supports the notion that B.S. and V.M. neglected L.S. by

failing to maintain the child's hygiene.  However, and as conceded by the Department,

little evidence supports the finding that L.S. faced manifest danger of *serious* neglect.

We remand for the trial court to vacate this finding.

*Remaining findings*

Substantial evidence also supports the remaining findings B.S. challenges on

appeal.

i. *Finding of fact C; finding of fact D (finding 1)*

Substantial evidence supports the trial court's findings, under finding of fact C and

finding of fact D (finding 1), that no parent or guardian is available to care for L.S.

Specifically, (1) the state of L.S.'s hygiene, (2) B.S.'s and V.M.'s parental deficiencies,

8

and (3) B.S.'s and V.M.'s lack of parental engagement coalesces to support the challenged findings.

### (a) L.S.'s hygiene

Special education teacher Camille Nelson, who worked with L.S. daily, testified that the child's hygiene began to deteriorate after her first month of working with him. During that time, L.S. began to arrive at school in dirty clothes or in his nighttime diaper from the previous night. At one point, L.S. arrived at school wearing sweatpants with his own vomit on them and then arrived at school wearing the same vomit-stained sweatpants for several days thereafter. When Ms. Nelson contacted B.S. and V.M. about these issues, the parents did not remedy the problems. Ms. Nelson testified that she saw no improvement in L.S.'s hygiene during the time she worked with him.

Viewed as a whole, Ms. Nelson's testimony supports the finding that neither B.S. nor V.M. was sufficiently engaged with L.S. to care for the child's needs. The parents attribute L.S.'s poor hygiene to his developmental challenges. However, no developmental challenge excuses a parent sending their child to school wearing a dirty diaper from the night before, or sending their child to school for days on end wearing the same vomit-stained sweatpants.

*(b) Parental deficiencies: B.S.*

The record establishes that B.S.'s regular interpersonal conflict caused him to fixate on his needs at the expense of L.S.'s well-being.

As one example, B.S. initiated a standoff with law enforcement when officers attempted to remove L.S. from B.S.'s home. Rather than cooperate with law enforcement or ask productive questions, B.S. escalated the conflict by asking an officer if he was "'willing to fight to [his] last breath'" to remove L.S. RP at 28. The standoff lasted seven hours, for the full duration of which L.S. remained within B.S.'s home witnessing his father's erratic behavior. Where a high-needs child is captive to a high-tension environment, and where his father rather than ameliorating the tension needlessly exacerbates and prolongs it, that father has shown himself numb to his child's needs.

On another occasion, B.S. failed to subordinate his distrust of V.M. to his child's well-being. Having decided that V.M. was cheating on him, B.S. took L.S. out of school, drove to Spokane, and left the high-needs child at the Vanessa Behan Crisis Nursery. When explaining his decision, B.S. did not express reservations about disrupting L.S.'s routines or schooling. He did not express any concern about the trauma L.S. would necessarily sustain as a result of being left for days in the care of strangers in an unfamiliar city. Instead, B.S. justified absconding with L.S. on the grounds that the men V.M. was involved with had harmed his child. However, B.S. did not explain how he

10

had reached that conclusion, given that L.S. is nonverbal and could not have relayed any such information.

On other occasions, B.S. became violent with V.M. V.M. claimed this violence had worsened in the years preceding L.S.'s removal, and that B.S. on one occasion had knocked her teeth out. On another occasion, B.S. had struck V.M.'s ribs with a baseball bat. Clearly, abuse of this sort evinces innumerable serious problems. Specific to this analysis, however, it evinces B.S.'s inability to prioritize the tranquility of L.S.'s homelife over his own need to actualize violent tendencies.

Taken together, the above episodes suggest a propensity on B.S.'s part to focus so myopically on his own quarrels, vendettas, and impulses as to overlook L.S.'s needs. Such behavior would be problematic in any parental context. It is particularly problematic where the child involved has heightened needs requiring acute parental vigilance.

*(c) Parental deficiencies: V.M.*

The record establishes that V.M.'s substance abuse issues and cognitive delays prevented her from caring for L.S. Additionally, V.M. demonstrated a wavering commitment to removing L.S. from a home where domestic violence was chronic.

After B.S. left L.S. at Vanessa Behan, the Department assisted V.M. in collecting L.S. from the shelter and establishing them both at a separate shelter. This represented an

opportunity for V.M. to care for L.S. in a safe environment fully removed from the threat B.S. posed. However, within 24 hours, V.M. forfeited their room at the shelter by smoking cannabis on the premises. The Department successfully intervened, securing V.M. a second chance at the shelter. However, only days later, the shelter removed V.M. permanently after catching her smoking cannabis a second time. In short, V.M. in the span of just a few days received two opportunities to house L.S. in an abuse-free environment, and in the span of just a few days her substance abuse issues thwarted both opportunities. Also, V.M. tested positive for methamphetamine use.

In addition to substance abuse, V.M.'s cognitive challenges frustrated her ability to care for L.S. For example, when Ms. Stacy gave V.M. instructions for how to enlist the services of a domestic violence advocate, V.M. was confused and could not follow those instructions. Ms. Stacy's account of V.M.'s cognitive limitations comports with Ms. Rodriguez's testimony. According to Ms. Rodriguez, V.M. "does have a hard time understanding—simple, like, commands and—the cognitive—there's some cognitive delays." RP at 42. Indeed, V.M. herself corroborated Ms. Stacy's and Ms. Rodriquez's assessments when she admitted to Ms. Stacy that her own cognitive delays prevented her from managing L.S.'s appointments and coordinating with L.S.'s school.

Finally, V.M. also demonstrated deficient parenting skills when she abandoned her efforts to extract L.S. from a home where domestic violence was chronic. As mentioned

already, V.M. did initially take steps toward achieving this extraction. She moved with L.S. to a shelter in Spokane and, when the shelter no longer was available, she checked into a hotel with her child. Moreover, she sought a protection order against B.S. However, rather than pursuing that order, V.M. abruptly changed course and reunited with B.S.

For the foregoing reasons, the record supports the finding that V.M.'s substance abuse issues, cognitive delays, and wavering commitment to removing L.S. from a violent home prevented her from caring for her child.

### (d) Lack of engagement with services

The record shows that B.S. and V.M. repeatedly declined opportunities to cultivate a better homelife for L.S. Specifically, B.S. and V.M. (1) refused to allow the Department to administer a urinalysis test to V.M., except at a date and time of B.S.'s choosing, (2) refused to permit a home walk-through, (3) failed to implement the hygiene instructions L.S.'s school provided, and (4) failed to visit L.S. in foster care despite the Department facilitating those visits by providing transportation.

### (e) Conclusion

The record supports the finding that B.S. and V.M. each exhibited deficiencies that prevented them from caring for L.S. The record also supports the finding that B.S. and

V.M. did not engage in services to remedy those deficiencies. The trial court appropriately entered finding of fact C and finding of fact D (finding 1).

### ii. Finding of fact 2

Substantial evidence supports the trial court's finding, under finding of fact 2, that B.S.'s and V.M.'s home is "volatile and unstable, characterized by domestic violence and drug use." CP at 152. The home is manifestly volatile and unstable, as B.S. and V.M. compelled L.S. to move four times in 11 days—from his own home to Vanessa Behan, from Vanessa Behan to a second shelter, from the second shelter to a hotel, and from the hotel back to his own home. During this time, L.S. was unable to attend school and benefit from the education and services he received there.[1]

The home also was characterized by domestic violence and drug use, as V.M. herself reported domestic violence to Ms. Stacy. V.M. also tested positive for methamphetamine use and twice in one week forfeited stable housing owing to her cannabis habit.

The trial court properly entered finding of fact 2. Moreover, this finding derived from substantial evidence—as described supra—even if the court erred where it stated on

---

[1] We infer that L.S., while living in Spokane, was unable to attend school in Ritzville, which is an hour's drive.

the record that law enforcement officers had regularly attended court proceedings to monitor B.S. To the extent that statement was error, it was harmless.

### iii. *Finding of fact 5*

Substantial evidence likewise supports the trial court's finding, under finding of fact 5, that "[L.S.]'s hygiene had become deplorable and unacceptable by the time [of removal]." CP at 152. As stated above, L.S. had begun arriving at school wearing used diapers from the preceding night. Once, he had arrived at school for several consecutive days wearing the same vomit-stained sweatpants. When the school informed B.S. and V.M. of these hygiene issues, B.S. and V.M. failed to remedy them. Moreover, these issues did not derive from L.S.'s autism, as autism does not prevent a parent from replacing vomit-stained sweatpants with clean ones. The trial court properly entered finding of fact 5.

### iv. *Finding of fact E*

Finally, substantial evidence supports the trial court's finding, under finding of fact E, that reasonable efforts to avoid removal failed because (1) L.S.'s "health, safety, and welfare . . . cannot be adequately protected in the home," and (2) specific services offered or provided to B.S. and V.M. have not succeeded in remedying parental deficiencies. CP at 147.

*(a) Reasonable efforts*

The Department made reasonable efforts to avoid out-of-home placement where it offered B.S. and V.M. the following: urinalysis testing, oral swabbing, family preservation services, domestic violence services, anger management classes, emergency housing, neuropsychological evaluation (for V.M.), and mental health evaluation (for B.S.). L.S.'s school also provided the family with coordinated special education services.

As a regimen, the above services responded to B.S.'s and V.M.'s specific parenting deficiencies—namely, chemical dependency, domestic violence, cognitive deficiencies, and mismanagement of child hygiene. B.S. argues the Department failed to offer a necessary service where it did not provide medication or toilet training services to address L.S.'s hygiene issues. However, B.S. and V.M. did receive adequate services in this regard where Ms. Nelson communicated to them that L.S. should not arrive at school in the same vomit-stained sweatpants for days on end. Washing and replacing the child's sweatpants did not require medication or toilet training services. It required only B.S. and V.M. to heed Ms. Nelson's instructions, which they failed to do. The trial court properly found that the Department had made reasonable efforts to avoid out-of-home placement.

16

*(b) Services unsuccessful*

Substantial evidence indicates that the services the Department offered B.S. and V.M. did not succeed. Despite Ms. Nelson's efforts, B.S. and V.M. failed to address L.S.'s hygiene deficiencies. Despite Ms. Stacy's efforts, V.M. both (1) failed to sustain safe housing for L.S., and (2) failed to separate herself and L.S. from a home where domestic violence was chronic. The urinalysis and home walk-throughs were not successful because B.S. thwarted these services. Where the Department administered an oral swab to V.M., that swab indicated methamphetamine use. Accordingly, the trial court properly found that services offered or provided to B.S. and V.M. did not obviate the need for out-of-home placement.

*(c) Inability to ensure health, safety, and welfare*

Notwithstanding the success or failure of offered services, substantial evidence indicates that the Department could not have ensured L.S.'s health, safety, and welfare in the family's home where B.S. obstructed the Department's access to that home. Even if B.S. and V.M. had accepted services, and even if those services had succeeded, the Department could not have ensured L.S.'s protection where it could not evaluate the child's domestic environment.

The trial court properly found that it could not protect L.S. while the child lived in B.S.'s and V.M.'s home.

17

### (d) Conclusion

By offering or providing services that addressed B.S.'s and V.M.'s parenting deficiencies, the Department made reasonable efforts toward avoiding out-of-home placement. Those efforts failed when B.S. and V.M. did not partake in the available services. Even if the services had succeeded, the Department could not ensure L.S.'s health, safety, and welfare where B.S. refused access to the family's home. For all these reasons, substantial evidence supports the trial court's finding of fact E.

### *Resulting orders*

#### 1. *Dependency order*

A dependency order is appropriate where the Department shows by a preponderance of evidence that the child in question meets one of the statutory definitions of a "dependent child." RCW 13.34.110(1). As one definition, a child is dependent where he "[h]as no parent, guardian, or custodian capable of adequately caring for [him], such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development." RCW 13.34.030(6)(c). When considering whether a parent may adequately care for a child, a trial court may consider both the child's special needs and the parent's limitations. *In re Dependency of Schermer*, 161 Wn.2d 927, 944, 169 P.3d 452 (2007).

Here, a preponderance of evidence supports the finding that B.S. and V.M. were not capable of caring for L.S., given the parents' limitations and the child's considerable needs. Specifically—as discussed supra—substantial evidence supports the following findings:

- L.S. is a high-needs child requiring intensive, sustained, and attentive care.

- V.M. failed to sustain safe housing for L.S. even where the Department affirmatively and repeatedly arranged such housing.

- V.M. failed to discontinue cannabis use even when doing so would have ensured continued safe housing for L.S.

- V.M. used methamphetamine.

- V.M. failed to remove L.S. from a home where domestic violence occurred and was worsening.

- V.M. failed to obtain the services of a domestic violence advocate despite the Department providing instructions for how to obtain those services.

- B.S. created a violent environment for L.S. by subjecting V.M. to physical abuse.

- B.S. failed to prioritize L.S.'s routines and schooling over his own vendettas, quarrels, and impulses.

19

- B.S. subjected L.S. to unnecessary stress and tension by initiating and prolonging a standoff with law enforcement in L.S.'s presence.

- B.S. refused drug tests and residential walk-throughs designed to ensure L.S.'s welfare and safety.

- Both B.S. and V.M. failed to care for L.S.'s personal hygiene, even after L.S.'s teacher informed them of hygiene deficiencies.

- Both B.S. and V.M. failed to visit L.S. in foster care despite the Department facilitating those visits by providing transportation.

In light of these verities, the trial court was justified in finding that B.S. and V.M. were more likely than not incapable of caring for L.S. *See In re Pers. Restraint of Pugh*, 7 Wn. App. 2d 412, 422, 433 P.3d 872 (2019) (a preponderance of evidence exists where the premise is more likely than not true). This is especially so given that B.S. and V.M. failed to provide any meaningful evidence in support of their ability to care attentively for a high-needs child. The dependency order was proper.

2. *Out-of-home dispositional order*

A trial court may not order out-of-home placement for a child unless the Department has first made reasonable efforts to obviate the need for such a placement. RCW 13.34.130(6). Where the court orders out-of-home placement, it must specify the offered or provided services that constitute the Department's reasonable efforts.

20

RCW 13.34.130(6).  Where such efforts fail, out-of-home placement may be appropriate.

RCW 13.34.130(6).  Out-of-home placement may also be appropriate where the

Department's efforts succeed but where the State nevertheless cannot ensure the child's

health, safety, and welfare in the parents' home.  RCW 13.34.130(6).

Here, the Department made reasonable efforts to obviate the need for out-of-home

placement where it offered or provided services tailored to B.S.'s and V.M.'s specific

needs.  Those efforts failed when B.S. and V.M. did not partake in the available services.

Even if the services had succeeded, the Department could not have ensured L.S.'s health,

safety, and welfare in the family home where B.S. refused access to that home.

INTERESTED RELATIVE

B.S. argues the trial court erred where it failed to explore the possibility of placing

L.S. with an interested relative.  We agree.

*Standard of review*

Our court reviews a child's dispositional order for abuse of discretion.  *In re*

*Dependency of A.C.*, 74 Wn. App. 271, 275, 873 P.2d 535 (1994).  A trial court exceeds

its discretion where its findings lack support from the record or where its conclusions

apply incorrect law.  *In re Dependency of T.L.G.*, 139 Wn. App. 1, 15, 156 P.3d 222

(2007).

No. 39817-0-III; No. 39818-8-III
*In re Dependency of L.S.*

*Placement with relative*

A trial court may authorize placing a child with an unrelated party only where the Department cannot place the child with an interested relative (or other party familiar with the child), or when doing so would harm reunification efforts. RCW 13.34.130(3).

Here, the Department informed the trial court that L.S.'s maternal grandmother was interested in caring for L.S. However, the court failed to complete the section of its boilerplate order related to relative placement. Moreover, the trial court at the fact-finding hearing did not address the possibility of relative placement. This was error.

## CONCLUSION

We generally affirm, but we remand for the trial court to vacate the "serious neglect" finding and to consider relative placement.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Lawrence-Berrey, C.J.

WE CONCUR:

Pennell, J.

Cooney, J.

22